954 A.2d 1156

**HSP GAMING, L.P., Appellant**

v.

**CITY OF PHILADELPHIA, Appellee.**

Supreme Court of Pennsylvania.

Aug. 22, 2008.

120

Stella Ming Tsai, Esq., Brian Charles Vance, Esq., James W. Christie, III, Esq., Matthew H. Shusterman, Esq., Christie, Pabarue, Mortensen and Young, Philadelphia, for City Council of Phila. & Councilmember Frank DiCicco.

Jennifer M. McHugh, Esq., West Conshohocken, Stephen A. Cozen, Esq., F. Warren Jacoby, Esq., Cozen O'Connor, Philadelphia; William H. Lamb, Esq., Scot Russel Withers, Esq., Lamb McErlane, PC, West Chester; Richard A. Sprague, Esq., Charles J. Hardy, Esq., Thomas A. Sprague, Esq., Sprague & Sprague, Philadelphia, for HSP Gaming, L.P.

Anthony Michael Pratt, Esq., Robin Peduzzi Sumner, Esq., Amy B. Ginensky, Esq., David Vincent Dzara, Esq., Pepper Hamilton, L.L.P.; Richard Gerson Feder, Esq., Shelley Roxanne Smith, Esq., Mark R. Zecca, Esq., Kelly Susan Diffily, Esq., City of Philadelphia Law Department, Philadelphia, for City of Philadelphia.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

### OPINION

Chief Justice CASTILLE.

This appeal presents the following issues: (1) whether the City of Philadelphia has the authority to issue a license authorizing construction on submerged lands under the Delaware River pursuant to Act 321 of June 8, 1907, P.L. 488, 53 P.S. § 14199 ("Act 321"); and, if so, (2) whether the City of Philadelphia's Notice of Revocation of License Issued in Error, dated January 24, 2008, was valid. For the reasons that follow, we hold that the City did indeed have the authority to issue the license that is the subject of this dispute, and that the City's attempted revocation of the license so issued was invalid.

On December 26, 2006, the Pennsylvania Gaming Control Board awarded a Category 2 Slot Machine license in Philadel-

phia to HSP Gaming, L.P. (aka "SugarHouse"), pursuant to the Pennsylvania Race Horse Development and Gaming Act ("Gaming Act"), 4 Pa.C.S. § 1101 *et seq.* The Gaming Control Board issued its Order and Adjudication on February 1, 2007. On March 2, 2007, Riverwalk Casino, L.P., an unsuccessful applicant, filed a petition for review pursuant to 4 Pa.C.S. § 1204, challenging the Gaming Control Board's Order and Adjudication. On July 17, 2007, the Gaming Control Board's Order and Adjudication was affirmed by this Court. *Riverwalk Casino v. Pa. Gaming Control Bd.*, 592 Pa. 505, 926 A.2d 926 (2007).

Pursuant to Chapter 14–400 of the Philadelphia Code, HSP submitted a proposed Plan of Development to the City of Philadelphia's Planning Commission on March 26, 2007. On May 22, 2007, the Planning Commission held a public hearing and approved HSP's Plan of Development. Notwithstanding the Planning Commission's approval, no action was taken by City Council on three bills relating to the Plan of Development.

On October 25, 2007, HSP filed a Petition for Review with this Court, requesting that an order be issued directing the City of Philadelphia and City Council to comply with their statutory duties to implement the Gaming Board's decision to license a casino at HSP's site in Philadelphia. On December 3, 2007, this Court entered a Per Curiam Opinion and Order declaring, *inter alia*, that HSP's Plan of Development was finally approved. *HSP Gaming, L.P. v. City Council*, 595 Pa. 508, 939 A.2d 273 (2007), *reargument denied* (Dec. 31, 2007).

During the pendency of the litigation, HSP submitted an application on October 29, 2007 to the City of Philadelphia Department of Commerce ("Commerce Department") for a license permitting construction or improvements on submerged lands pursuant to Act 321 and Chapter 18–100 of the Philadelphia Code. HSP requested permission to construct upon lands in the Delaware River immediately adjacent to the property for its casino. Such permission is required because a riparian land owner (that is, an owner of property abutting a river) has title to the property up to the low-water mark of the

river, while the Commonwealth retains title below the low-water mark. *See United States v. Pa. Salt Mfg. Co.,* 16 F.2d 476 (E.D.Pa.1926).

Act 321 provides:

Whenever any person or persons shall desire to construct, extend, alter, improve or repair any wharf, or other building in the nature of a wharf, or bridge, or other harbor structures, situate wholly within any city of the first class, such person or persons shall make application to the director, stating in writing the nature and extent of such proposed structure, extension, alteration, improvement or repair, and file in the office of the director the plans and specifications showing fully the proposed structure, extension, alteration, improvement or repair, and produce his or her deed or deeds, or other evidence of title, to the premises on which such proposed structure, extension, alteration, improvement or repair is to be erected or made,-where-upon, if such proposed structure, extension, alteration, improvement or repair will encroach upon the waterway, the director shall give notice of the time and place of hearing such application, to all parties interested, by advertising twice a week for two successive weeks, in two newspapers of general circulation published within the said city, and by posting notice upon the said premises; and if the director, upon such hearing, or without such hearing where such hearing is not required by the provisions hereof, shall approve such proposed structure, extension, alteration, improvement or repair, and the plans and specification submitted therefor, he shall give his assent to, and issue a license or permit to be recorded in his office, in a book to be kept by him for that purpose, and such license or permit shall not be unreasonably withheld; Provided, That necessary repairs, costing one hundred dollars or less and not affecting the stability or strength of the structure, may be made without first procuring a license or permit.

Whenever any person or persons shall desire to construct, extend, alter, improve or repair any structure to be erected, or already erected, on ground supported by bulkheads, and

to be used, or already used, for the purpose of loading or unloading passengers or freight on or from vessels; or any structure to be physically connected, or already physically connected, or to be used or already used, as appurtenant to any wharf or structure hereinbefore described, situate within any city of the first class,-and for such purpose he or they shall have applied for a permit from the Bureau of Building Inspection in said city, the said Bureau of Building Inspection shall notify the director of the Department of Wharves, Docks and Ferries, of such application, and shall thereafter grant the permit applied for, only when the application shall have received the approval of the said director, which he is hereby empowered to grant.

The cities of the first class may, by ordinance, regulate and determine the license fees for the license and approval required by the provisions of this act.

53 P.S. § 14199.[1,2]

Philadelphia is a city of the first class, and Act 321 is implemented by Section 18–103 of the Philadelphia Code, which states:

1. The responsibilities of the Department of Wharves, Docks and Ferries were transferred to the Commerce Department under the 1951 Home Rule Charter.

2. Preliminarily, we note that the City asserts that the Commerce Director should have interpreted "harbor structure" restrictively to preclude the issuance of a submerged lands license because a gaming facility is to be built upon HSP's land. The Statutory Construction Act provides that, when interpreting a statute, "[w]ords and phrases shall be construed according to the rules of grammar and according to their common and approved usage." 1 Pa.C.S. § 1903(a). "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all of its provisions." 1 Pa.C.S. § 1921(a). The General Assembly "is presumed not to intend any statutory language to exist as mere surplusage." *Commonwealth v. Ostrosky*, 589 Pa. 437, 909 A.2d 1224, 1232 (2006).

The terms "pier, wharf, or harbor structure" are not defined in the statute, but their meaning is not obscure. Thus, for example, Black's Law Dictionary defines "wharf" as "[a] structure on the shores of navigable waters, to which a vessel can be brought for loading and unloading," and "structure" to include "[a]ny construction, production, or piece of work artificially built up or composed of parts purposefully joined together." BLACK'S LAW DICTIONARY 1589, 1436 (7th ed.1999).

(1) A permit shall be obtained before any pier, wharf or other harbor structure is built, extended, altered, improved or repaired, other than necessary repairs of the existing structure not more than $300.

(2) Application for such permit shall be made to the Department of Licenses and Inspections in such form as the Department requires.

(a) No permit shall be issued unless the proposed construction will conform to the regulations of the Department of Commerce.

(3) If the proposed structure, extension, alteration, improvement or repair will encroach upon the waterway, no permit shall be granted until a public hearing on the application has been held by the Department of Commerce, preceded by notice by advertisement twice a week for two successive weeks in two newspapers of general circulation published in the City.

(a) The applicant for the license shall arrange and pay for the advertisements and furnish the Department of Licenses and Inspections with proof of such advertisement prior to the hearing.

(4) The fee for the issuance of a permit shall be $1.50 per $1,000 cost of construction up to $100,000 and $.75 for each additional $1,000 cost of construction thereafter, but the fee shall not be less than $10 where a public hearing is required, nor for less than $3 where no public hearing is required.

HSP asserts that its proposed public dock and pier, public right-of-way, waterfront promenade and public park fall within the ordinary definitions of pier, wharf, and harbor structure. It contends that there is no basis for the City's more restrictive interpretation of the term "harbor structure." HSP contends that such a narrow interpretation disregards the context of the term within Act 321 and the wide array of uses for which licenses have been issued pursuant to the Act, including licenses previously issued for the construction of a sugar refinery on the land at issue. We agree that the statutory language does not restrict the landowner's use of its property adjoining the waterfront in the way the City now advocates; that is a matter left to local zoning law. The construction of piers, wharves, or other harbor structures as part of the development of a permitted use falls within Act 321.

(5) The Department of Licenses and Inspections may itself or by contract remove any structure built without the permit required by § 18–103(1) or in violation of the regulations of the Department of Commerce, the cost to be charged against the owner. The Law Department may take such action for the collection of costs, by lien or otherwise, as may be authorized by law.

In accordance with the provisions of Act 321, HSP submitted the following documents as part of its Application: (1) the Plan of Development that was approved by the City Planning Commission on May 22, 2007; (2) a copy of the foundation permit set of drawings for the Phase I casino building and ten-story parking garage; (3) a copy of the schematic design documents for the south valet parking lot during Phase I, the riverfront promenade and greenway, and the future phases of the casino and entertainment complex; and (4) a Submerged Lands Application binder including, *inter alia,* the consolidated metes and bounds description of the site, the metes and bounds description of the site areas for which the submerged lands license was requested, a public participation and public access summary, the ownership history for the site, a copy of the recorded Memorandum of Agreement of Sale, and a Survey and Consolidation Plan.

Before the Commerce Department's scheduled hearing on HSP's Application, Philadelphia City Councilman Frank DiCicco requested an opinion from the City of Philadelphia's Law Department "on the basis of [HSP's] Application, including where the state has granted the City the authority to consider such an Application, and how the City has applied and utilized such authority." R. at 443.[3]

On November 13, 2007, City Solicitor Romulo L. Diaz, Jr., issued an opinion regarding the authority of the Commerce Department to act upon HSP's application and to issue a riparian license. City Solicitor Diaz provided a history of the Commerce Department's authority to issue licenses for submerged lands within the City of Philadelphia, and advised

**3.** The specific citations to the record set forth herein refer to HSP's Exhibits in Support of Petition for Review, Volumes I through V.

Councilman DiCicco that it was his opinion that the City indeed had the authority to issue such licenses under Act 321. *Id.*

On November 15, 2007, the City of Philadelphia Department of Commerce, per Commerce Director Stephanie W. Naidoff, conducted a public hearing on HSP's application.[4] During the hearing, HSP's presentation depicted the present condition of the submerged lands and detailed the proposed development of the submerged lands. HSP submitted affidavits of publication of the requisite public notice, as well as documentation regarding the posting of notice on the site.

Joyce Wilkerson, the Chief of Staff to Mayor John Street, testified that Mayor Street had created the Philadelphia Gaming Advisory Task Force in January 2005 in response to the General Assembly's decision to locate two licensed gaming facilities within the City. The Gaming Advisory Task Force was created to assist the City in its "efforts to assure that the casino developments was [sic] done in a manner that balanced the needs of casino operators with those of the impacted communities and the City as a whole." R. at 274. On October 27, 2005, the Gaming Advisory Task Force issued a final report detailing the challenges and opportunities of gaming in Philadelphia, which was adopted by the City.

Wilkerson testified that after the Gaming Control Board awarded the Philadelphia gaming licenses in December of 2006, the administration worked with the two successful applicants over eleven months to ensure that the casinos were developed in a manner consistent with the Gaming Advisory Task Force's recommendations and the comprehensive goals of the Commercial Entertainment Districts ("CEDs") under Chapter 14–400 of the Philadelphia Code.[5] Wilkerson testified

---

4. The Department of Commerce and the Department of Licenses and Inspections are municipal departments within the City of Philadelphia created pursuant to Section 3–100(d) of the Philadelphia City Charter.

5. On February 23, 2006, City Council of the City of Philadelphia enacted Ordinance No. 051028–AA. The ordinance added Chapter 14–400 to the provisions of the Philadelphia Code in anticipation of the award by the Gaming Control Board of slot machine licenses in the City. The ordinance created a new zoning classification referred to as

that the City worked with the two casino developers to provide protections for the City beyond those contemplated by the CED ordinance, including binding agreements relating to traffic mitigation, public access to the waterfront, job participation for City residents, payments in lieu of taxes to the City, high quality building design, and community benefits agreements with funding. R. at 275–76.

Janice Woodcock, Executive Director of the Philadelphia City Planning Commission, testified that her staff had reviewed HSP's application for a submerged lands license. Woodcock stated that HSP's application was entirely consistent with HSP's Plan of Development that had been approved by the Planning Commission on May 22, 2007. She further stated that the Planning Commission supported the granting of the submerged lands license, by way of approving the rezoning as a CED, the Plan of Development, and the design of the project. R. at 283.

Robert F. Murray of the Department of Licenses and Inspections testified that HSP had provided the information and forms that were required to be submitted as part of its request for a foundation permit, with the exception of prerequisite approval from the Department's Zoning Unit and the Philadelphia Water Department, which were not part of that application.[6] Murray proffered his opinion that the submission met the requirements of the Philadelphia Code and of the Department of Licenses and Inspections to have a foundation permit issued once all of the prerequisite approvals were obtained. R. at 283–84.

At the public hearing, the Department of Commerce also entertained statements by proponents and opponents of casino

Commercial Entertainment Districts. The CED ordinance was "intended to encourage the orderly development of major entertainment facilities and certain other uses in accordance with an approved plan of development," without interfering with the Gaming Control Board's approved locations of the casinos. Phila. Code. § 14–401(1); HSP Gaming, L.P. v. City Council, 595 Pa. 508, 939 A.2d 273, 275 (2007).

6. The Commerce Department conducts the hearing on the license application, while the application is processed by the Department of Licenses and Inspections. Phila. Code § 18–103(2), (3)(a).

development, including City Councilman DiCicco, regarding their opinions of the impact of the licensed gaming facility on use of the waterfront, tourism, convention center business, job creation, community benefits, residential development, traffic, and neighborhood concerns. State Representative Michael H. O'Brien and State Senator Vincent J. Fumo attempted to raise questions regarding the Commerce Department's authority to issue a riparian license; State Representative William Keller submitted a written statement on the issue.

On November 27, 2007, Commerce Director Naidoff issued a decision authorizing the issuance of a license to permit HSP to use the portion of the Applicant Submerged Lands as described in HSP's Plan of Development. With respect to the statements of those who had expressed opinions in favor of or opposed to the authorized casino development, Commerce Director Naidoff noted that such opinions were not relevant to the task before her:

> Public testimony at the Hearing largely focused on whether the Site is an appropriate location for a casino, rather than the narrow issue before me, which is whether to grant a license to develop over the Applicant Submerged land. The location of the Philadelphia casinos has been decided by the Gaming Control Board, and it is beyond my authority to change such a decision. *See* 4 [Pa.C.S.] § 1101 *et seq.* (2007); Phila. Code.[sic] § 14–405(2) ("Nothing in this Chapter shall limit the right of the Pennsylvania Gaming Control Board under the [Pennsylvania Race Horse Development and Gaming] Act to identify the property on which it will permit a Category 2 licensed gaming facility.").

R. at 1462 n. 1.[7]

Turning to her authority to issue the requested license, Commerce Director Naidoff stated that, "[w]hile certain witnesses questioned the legal authority of the City to consider the instant application ..., the City Solicitor has concluded that the City, and the Commerce Director specifically, are

7. Under the Gaming Act, the Gaming Control Board has exclusive authority to determine the location of licensed slot machine facilities. 4 Pa.C.S. § 1304(b)(1).

authorized by state and local law to act on the instant Application...." R. at 1462–63 n. 2.

Commerce Director Naidoff then set forth the following findings of fact:

1. The Application was filed on October 29, 2007. *See* App. § 1; hearing notes of testimony ("H.T.") at p. 4, 1. 10–11.

2. Advertisements noticing the Hearing were published in the *Philadelphia Daily News* on November 1 and November 2, November 8, November 9, November 12, and November 13, the *Philadelphia Inquirer* on November 8, November 9, November 12, and November 13, and the *Philadelphia Tribune* on November 2 and 4. *See* Applicant Exhs. 1–2, 10–11. All three are newspapers of general circulation in Philadelphia.

3. The Site was posted continuously from and including October 30, 2007, through and including November 15, 2007. *See* Applicant Exhs. 3–4.

4. The Premises, the former Jack Frost refinery site, are situated on 22 acres along the Delaware River, and include Piers 41 North to 48 North. *See* App. § 1; H.T. at p. 12, 1. 18–21.

5. The Applicant Submerged Lands consist of approximately 12 acres immediately adjoining the Site, 52 percent of the total area of the premises. *See* App. § 1.

6. Applicant submitted proof of title in the form of a Memorandum of Agreement, recorded January 10, 2006, in the Department of Records, which grants Applicant an existing option to buy the Premises. *See* App. § 7(a); H.T. at p. 17, 1. 20–24.

7. The Applicant also submitted various deeds and related documents of the owners of the several parcels of land that make up the proposed casino and a consent to the filing of the Application from the grantors of the option to buy the Premises. *See* App. § 7(b); Applicant Exh. 6.

8. The Premises currently are vacant and fenced, offering no public access to the waterfront or any other portion of

the Premises. *See* H.T. at p. 12, l. 18–21, p. 24 l. 9–10; App. Exh. 3.

9. The Applicant Submerged Lands also are completely inaccessible to the public from fast land. *Id.*

10. The Applicant Submerged Lands are in a state of decay consisting of mud, rubble, and the remains of previously constructed piers. *See* Applicant Exh. 5 at 6–8, H.T. at p. 20, l. 16–21.

11. There are no above ground structures remaining on the Applicant Submerged Land, and the area has been fenced for reasons of public safety. *See* Applicant Exh. 5 at 3, 5; H.T. at p. 24, l. 7–10.

12. As the Premises are developed for the Project, Applicant plans, among other things, to widen and extend Pier 41; relocate, expand, and extend the Laurel Street combined sewer; demolish and remove the dilapidated structures at Piers 42, 43, and 46 North; remove the fill at the end of Piers 42 and 43 North; place new fill between Piers 41 and 42 North and Piers 43 and 44 North; construct approximately 1,200 feet of bulkhead/high-deck structure and 2,100 feet of public greenway; construct a minimum of four new 36-inch diameter storm water outfalls, and design and construct the casino and the accessory buildings and facilities, including the driving and loading of test pilings, set forth in the Application. This will involve construction both east and west of the low water mark. *See* App. § 1.

13. Applicant will remove significant debris, such as abandoned loading and mooring features, from the Applicant Submerged Land such that, after completion of the improvements proposed by Applicant, more of the Delaware River will be available for navigation and public use. *See* App. § 6; Applicant Exhs. 5, 8; H.T. at pp. 20–21; pp. 31–33.

14. Applicant's proposed Project ensures public access to the Delaware riverfront by including a public dock and a pier, a landscaped public right-of-way at least 50 feet wide across the eastern border of the Premises, and a fan-shaped

waterfront public park. *See* App. § 1; Applicant Exh. 5; H.T., p. 21, 1. 1–3, 14–16, p. 84, 1. 18–20.

15. Applicant is developing the fan-shaped park in a manner that will expand the habitable area for blue crabs and other benthic organisms that are important resources for fisheries. *See* App. § 6; Applicant Exh. 8 at 3.

16. The Project also will include a ferry and water taxi dock that will promote transit to and from other destinations on both sides of the River. *See* Drawing C–02, dated March 29, 2007, of Section 3 of the Plan of Development; H.T. at p. 26, 1. 16–19.

17. Applicant will construct the public greenway and waterfront promenade in a manner that protects the current open waters adjacent to the Premises and encourages the free flow of water, such that after the improvements proposed by Applicant the area of the Delaware River where water freely flows will be enlarged. *See* App. § 6; Applicant Exh. 8 at 3.

18. Applicant's projected cost of construction for the portion of the Applicant Submerged Lands between the Bulkhead Line and the Pierhead Line is $349.76 million. *See* Applicant Exh. 8 at 1–3.

19. The improvements proposed in the Application are consistent with the Applicant's Plan of Development approved by the Philadelphia City Planning Commission ("Planning Commission") on May 22, 2007, pursuant to Chapter 14–400 of the Philadelphia Code. The development of the waterfront trail and access is entirely consistent with the objectives and efforts of the Planning Commission to improve access to the Delaware Riverfront for all Philadelphians. *See* H.T. at p. 43, 1. 7–10.

20. The Application meets the requirements of the Department of Licenses and Inspections ("L & I") to have a foundation permit issued once all of the prerequisite approvals are obtained. *See* H.T. at p. 44, 1. 17–21.

R. at 1463–66.

Commerce Director Naidoff determined that the advertising and posting of the premises had been completed as required,

and that HSP had demonstrated sufficient evidence of equitable title to the premises. She concluded that HSP's application had sufficiently detailed the nature and extent of the proposed structures, extension, alteration, improvement or repair at the premises.

After consideration of HSP's Application and the information presented at the hearing, Commerce Director Naidoff made the following Conclusions of Law, *inter alia:*

8. The Project will result in the removal of debris currently impeding this dangerous and abandoned section of the waterfront. *See* F.F. 10–13.

9. The Project will create public recreational access to the Delaware River waterfront at the Premises that does not exist currently. *See* FF. 8–11, 13–14, 19.

10. The flow of the Delaware River is likely to improve, and the area available for fishery is likely to increase. *See* F.F. 10, 13–15, 17.

11. The Project does not interfere with public access, fishery or navigation, and, in fact, it actually improves navigation, fishery, and the stream of the Delaware River at the Premises. *See* F.F. 10. 13–17, 19.

12. The new taxi and ferry dock will promote river traffic. *See* F.F. 16.

13. Licensing the use of the Applicant Submerged Lands for the Project, in the manner contemplated by the Plan of Development, will improve all aspects of the Project, and positively will enhance the impact of the development on all who use the river for recreation, navigation, fishery, and commerce. *See* F.F. 8–11, 13–17, 19.

14. Weighing all factors, the Project is in the public interest. *See* F.F. 8–13, 15–17, 19.

R. at 1467–68.

Consistently with her findings, Commerce Director Naidoff authorized the issuance of the license for "the use of submerged lands from the low water mark to the end of the permitted development at the easternmost point of the Plan of Development approved by the Planning Commission." R. at

1469 n. 4. The license was subject to specific requirements, including: (1) the obligation that construction commence within 6 months, (2) payment of the applicable license fee, and (3) construction in accordance with HSP's approved Plan of Development.

Pursuant to Phila. Code § 18–103(4), the license fee was to be set at $1.50 per $1,000 cost of construction up to $100,000, and at $0.75 for each additional $1,000 cost of construction thereafter. Commerce Director Naidoff stated that the fee would be calculated on the amount of money that HSP expected to spend on the development of the project over the Applicant Submerged Lands. The total construction costs were calculated as follows:

> Applicant has submitted evidence that its estimated construction costs on the Applicant Submerged Lands is $349.76 million, comprising $116.45 million for Phase I and $233.30 million for Phase II. The projected cost for Phase II of construction is based on an increase in construction costs of 3.5 percent per year. I conclude that the projected increase is too low and take official notice that Applicant has suggested that the City use for this project an increase in the cost of money of five percent per year, which figure I will accept for this purpose. Thus, for the purpose of the fee calculation, I will treat Phase II construction costs as increased to $258.01 million, bringing the total construction costs on the Submerged Lands to $374.46 million.

R. at 1469–70. In accordance with this finding, the license fee was determined to be $282,270.00. On November 27, 2007, HSP paid the City the sum of $282,270.00 as payment of the licensing fee. R. at 462.

On December 26, 2007, Senator Fumo, Representative O'Brien, Senator Michael J. Stack, Representative John J. Taylor, Representative Michael P. McGeehan, and Representative Robert C. Donatucci filed, in this Court, a Petition for Review in the Nature of an Appeal from a Final Determination of a Political Subdivision Pursuant to 4 Pa.C.S. § 1506 and 53 P.S. § 14202 from the Commerce Department's deci-

sion to authorize and approve the issuance of the license.[8] That Petition is docketed at No. 207 EM 2007. On December 27, 2007, the City Council of the City of Philadelphia and Councilman DiCicco filed a separate Petition for Review and Request for Injunctive Relief in the Nature of an Appeal of a Final Determination of a Political Subdivision Pursuant to 4 Pa.C.S. § 1506 and 53 P.S. § 14202 from the decision. That Petition is docketed at No. 208 EM 2007. HSP filed notices of intervention in both appeals.

Shortly after the appeals were filed, the Honorable Michael A. Nutter was sworn in as the Mayor of the City of Philadelphia on January 7, 2008. The new mayoral administration replaced Commerce Director Naidoff with Acting Commerce Director Duane H. Bumb.

On January 24, 2008, Acting Commerce Director Bumb mailed a "Notice of Revocation of License Issued in Error" ("revocation notice") to HSP. The notice stated:

The license dated November 27, 2007, issued to HSP Gaming, L.P. by the City of Philadelphia, Director of Commerce and the Commissioner of Licenses and Inspections, to encroach upon the waterway of the Delaware River and to construct upon submerged lands the SugarHouse Casino Project, is hereby REVOKED as having been issued in error. Within thirty (30) days of the date of this Notice, you may request a hearing before the Director of Commerce to challenge the basis for this revocation and/or to allow consideration by the Director of additional factors, not

8. In *HSP Gaming, L.P. v. City Council,* 595 Pa. 508, 939 A.2d 273 (2007), HSP filed an earlier Petition for Review to compel City Council for the City of Philadelphia and the City to comply with their statutory duties to implement the Gaming Control Board's decision awarding a Category 2 slot machine license to HSP. We granted HSP's request for relief based upon City Council's unreasonable failure to implement the Gaming Control Board's decision.

In that matter, Senator Fumo filed an Amicus Curiae Brief in Opposition to the Petition for Review, asserting that HSP could not obtain control of or a property interest in the river bed of the Delaware River without state legislative authorization. We determined that the issue of authority to grant riparian rights could not be addressed at that stage of the proceedings as HSP had not raised that issue in its Petition for Review. 939 A.2d at 287 n. 15.

previously or adequately considered by the Director of Commerce in the November 27, 2007, decision. Alternatively, you may file an appeal of this revocation within thirty (30) days of the date of this Notice.

The license was issued in error because, *inter alia:*

1. The Director of Commerce improperly excluded from proper consideration the appropriate use of the submerged lands, including its proposed use as a licensed gaming facility, a question expressly not decided by the Gaming Control Board and expressly left for the appropriate authorities to consider.

2. The scope of the license is insufficiently precise and is in need of clarification, in that the license purports to authorize the project as described in the Gaming Board's Adjudication, and/or as described in the Plan of Development approved by the City Planning Commission, which two descriptions are not identical. For a project of this magnitude and controversy, there must be no ambiguity regarding the scope of the authorization.

3. The Director of Commerce acted contrary to the intent and understanding of the Gaming Control Board and the General Assembly, in that the licensee was expected to seek from the General Assembly the right to encroach into the Commonwealth's waterways; and that the General Assembly would consider such request and apply statewide standards relating to riparian rights. To date, the General Assembly has not granted the licensee the requested encroachment rights. The Director of Commerce's decision to act in contravention of this expectation is contrary to the intent and expectation of the Gaming Control Board and the General Assembly, as well as local residents and the elected officials representing those residents; and, therefore, not in the best interests of the City or the general public.

4. The Director of Commerce should not exercise discretion to issue a license prior to resolution of the City's negotiations with the applicant with respect to wetlands mitigation or the Commonwealth Department of Environmental Protection's approval of an alternative mitigation

plan, a prerequisite to the proposed encroachment into the Commonwealth's waterways. The Director of Commerce should exercise discretion in a manner consistent with the overall City interest in maintenance of wetlands.

5. Given the previously moribund nature of the City's authority under Act 321, the Director of Commerce should exercise discretion not to expansively apply the authorization to permit a "harbor structure" to authorize a large scale casino project, and not to expansively allow an option to purchase to satisfy the requirement of title.

6. Based on the current record, including the deficiencies identified above, the issuance of the license is against the public interest, particularly when issued by and based on analysis performed by City officials who serve at the pleasure of an appointing authority whose term of office was about to expire.

R. at 1475–76.

On February 22, 2008, HSP filed the instant Petition for Review, docketed at No. 28 EM 2008, challenging the City's authority to issue the revocation notice.[9] In its Petition for Review, HSP invokes this Court's appellate jurisdiction pursuant to Section 1506 of the Gaming Act, which provides as follows:

In order to facilitate timely implementation of casino gaming as provided in this part, notwithstanding 42 Pa.C.S. § 933(a)(2) (relating to appeals from government agencies), the Supreme Court of Pennsylvania is vested with exclusive appellate jurisdiction to consider appeals of a final order, determination or decision of a political subdivision or local instrumentality involving zoning, usage, layout, construction or occupancy, including location, size, bulk and use of a

9. On February 25, 2008, the City mailed a check to HSP in the amount of $282,270.00, purporting to refund HSP's payment of the licensing fee based upon the January 24, 2008 "Notice of Revocation of License Issued in Error." *See* Consolidated Brief in Opposition to HSP Gaming, L.P.'s Petition for Review, Application for Summary Relief, and Application for Stay Pursuant to Pa.R.A.P. 1781, Exhibits C, D.

licensed facility. The court, as appropriate, may appoint a master to hear an appeal under this section.

4 Pa.C.S. § 1506.[10]

On March 19, 2008, this Court directed that the appeals docketed at Nos. 207 EM 2007 and 208 EM 2007 be listed for oral argument. On April 3, 2008, the City filed a "Consolidated Application for Consolidation of 28 E.M.2008 With 207 and 208 E.M.2007 Pursuant to Pa.R.A.P. 123 and 513." The City requested that the three matters be consolidated or, alternatively, that the City's Consolidated Brief filed in Opposition to HSP's Petition for Review at 28 EM 2008 also be docketed at 207 and 208 EM 2007. The City noted that it had taken three different positions on its authority to issue the submerged lands license and its authority to revoke the license while appeals were pending. The City further stated that its filings in the matters docketed at 207 and 208 EM 2007 did not reflect its most recent position on the issues. The City asserted that consolidation of the three matters would provide this Court with a complete view of the City's changing positions, including its latest position, which was that position taken in 28 EM 2008.

On April 11, 2008, this Court entered an order holding the City's application pending disposition of the matters docketed at 207 EM 2007 and 208 EM 2007. Oral argument was then heard in Nos. 207 and 208 EM 2007 on April 15, 2008.

The City's request to consolidate the three matters is now hereby granted, in order to provide for a comprehensive consideration of the different positions taken by the City during the pendency of the various appeals, and in order to

10. Under 42 Pa.C.S. § 933(a)(2), the common pleas courts have jurisdiction of "[a]ppeals from final orders of government agencies, except Commonwealth agencies, under Subchapter B of Chapter 7 of Title 2 (relating to judicial review of local agency action) or otherwise." Subchapter B of Chapter 7 of Title 2 refers to the Local Agency Law. Under the Local Agency Law, local administrative actions that constitute adjudications are subject to review in the courts of common pleas under Section 933(a)(2). *See* 2 Pa.C.S. § 752.

facilitate a speedy and global resolution of the question concerning the submerged lands license.[11]

The City asserts that this Court does not have jurisdiction over HSP's appeal from the revocation notice. The City contends that HSP's appeal should have been filed with the common pleas court pursuant to Section 19 of Act 321 (Appeal from decision of director; petition to common pleas; notice; hearing; costs), which provides in relevant part that:

Any person or persons aggrieved by any decision of the said director, either granting or refusing, in whole or in part, an application for a license to erect, construct, extend, alter, or improve any wharf, pier, or bulkhead, or other harbor structure, or as to any other matter or thing under this act, may, within thirty days after the date of the said decision, present a petition to the court of the proper county, setting forth the facts of the case and the ground of the petitioner's complaint. . . .

53 P.S. § 14202.

The City relies upon this Court's decision in *Philadelphia Entertainment & Development Partners, L.P. v. City of Philadelphia*, 595 Pa. 538, 939 A.2d 290 (2007) (*"PEDP I"*), as support for its argument that review by the common pleas court was required before this Court may exercise its jurisdiction under § 1506 of the Gaming Act. In that case, Philadelphia Entertainment and Development Partners ("PEDP")[12] had filed an application with the City of Philadelphia's Department of Licenses and Inspections ("Department") for a zoning

11. We note that on March 7, 2008, City Council and Councilman DiCicco filed an Application for Leave to Intervene in this matter. The application states that, "[i]f permitted to intervene, City Council and Councilmember DiCicco would incorporate by reference their opposition to [HSP's Applications for Ancillary Relief filed in 207 E.M.2007 and 208 E.M.2007] and adopt the corresponding arguments of City made in its Consolidated Answer to HSP's Application for Summary Relief and in response to this Petition for Review." *See* Application for Leave to Intervene at 3 n. 2. We acknowledge that City Council and Councilman DiCicco would raise the same arguments that have been presented by the City and considered herein.

12. The Gaming Control Board had approved PEDP's application for a Category 2 slot machine license in Philadelphia on December 20, 2006.

and use registration permit. PEDP's permit application was not made under the framework set forth in Chapter 14–400 of the Philadelphia Code that had been adopted in anticipation of gaming.

Instead, PEDP's amended permit application was premised on the property's designation for C–3 Commercial zoning, requesting a permit for an amusement arcade.[13] The Department issued a notice of refusal because the proposed use of the property for an amusement arcade was prohibited as its location was within 1,000 feet of another regulated use. Under the Philadelphia Code, the notice of refusal was subject to review by the Philadelphia Zoning Hearing Board of Adjustment ("Zoning Hearing Board"). PEDP had sought review of the notice of refusal by the Zoning Hearing Board, but had requested that a scheduled hearing be continued.

During the pendency of the appeal before the Zoning Hearing Board, PEDP filed a petition for review with this Court, invoking this Court's jurisdiction under Section 1506 of the Gaming Act. PEDP requested that an order be entered reversing the Department's notice of refusal and directing that the permit be issued. The City of Philadelphia asserted that the notice of refusal was not final or reviewable under Section 1506 because the Department's issuance of the notice of refusal to PEDP was subject to review by the Zoning Hearing Board under the Philadelphia Code.

This Court determined that the Department's notice of refusal was not a final order, determination or decision of a political subdivision or local instrumentality within the meaning of Section 1506, because the relevant provisions of the Philadelphia Code provided for a two-step permitting process, and PEDP had not completed the second step of the process. We stated:

13. At the same time, PEDP was also pursuing the specialized process established under Chapter 14–400 of the Philadelphia Code (relating to the new zoning classification for CEDs), but those efforts were not relevant to the matter before the Court. The procedures that must be followed under Chapter 14–400 were summarized in *Philadelphia Entertainment and Development Partners, L.P. v. City Council for the City of Philadelphia*, 943 A.2d 955, 956–57 (Pa.2008) (*"PEDP II "*).

The first step is the decision the Department makes on a permit application. Under the Philadelphia Code, the Department accepts applications for a zoning or use registration permit, and may grant the permit sought, refer applications to the Zoning Hearing Board for a certificate for regulated uses, or issue notices of refusal. Phila. Code § 14–1702, 14–1703. The second step is the decision the Zoning Hearing Board renders on the propriety of the Department's decision. Under the Philadelphia Code, if requested, the Zoning Hearing Board reviews the Department's decision, and may affirm, reverse, or modify it, issue the permit, grant a special exception or a variance, or issue a certificate for regulated uses. Phila. Code, §§ 14–1705, 14–801, 14–802, 14–1804, 14–1605(4). Further, under the Philadelphia Code, the decisions the Zoning Hearing Board issues are designated as appealable to the court of common pleas. Phila. Code. § 14–1807.

939 A.2d at 296. Because the Department's issuance of the notice of refusal was only the first step in the process required to be followed, we quashed PEDP's appeal.

■ In contrast to the zoning provisions of the Philadelphia Code analyzed in *PEDP I*, the separate and distinct provisions of Act 321 and the Philadelphia Code governing applications for a submerged lands license do not establish a two-step procedure for review by the Department of Commerce. In the absence of the specific provisions of Section 1506 of the Gaming Act, an appeal from the decision of the Department of Commerce by any person aggrieved by such decision indeed would be brought before the common pleas court under 53 P.S. § 14202. Pursuant to Section 1506 of the Gaming Act, however, this Court is vested with exclusive appellate jurisdiction of HSP's appeal from the revocation notice as the appeal has been taken from a final order of a political subdivision or local instrumentality involving the "construction or occupancy, including location, size, bulk and use of a licensed facility." Thus, we reject the City's jurisdictional argument.

Before we consider whether the City's revocation notice was valid, we must first address the predicate issue of whether the

City had the authority to issue a license authorizing construction on submerged lands of the Delaware River pursuant to Act 321. HSP asserts that the General Assembly in Act 321 granted the City specific authority to license the use of submerged lands in the Delaware River within the confines of the City. HSP also contends that the City's specific authority was neither explicitly nor implicitly repealed by the enactment (and amendment) of what is now the Dam Safety and Encroachments Act, 32 P.S. § 693.1 et seq.

In response, the City, as noted, has taken three different positions respecting its power to issue submerged lands licenses under Act 321. In its response to Senator Fumo's appeal from the Commerce Director's November 27, 2007 decision (at 207 EM 2007), the City vigorously defended its authority and the Commerce Director's decision. The City asserted that Act 321 had delegated to the director of the City's Department of Wharves, Docks and Ferries the authority to "issue a license or permit for the erection and making" of any "proposed structure, extension, alteration, or improvement or repair that will encroach upon [the Delaware River]" in Philadelphia and that the Department of Commerce undertook that authority after the City's transition to home rule in 1951.[14]

In the appeal filed by City Council (at 208 EM 2007), the City, under the new mayoral administration, filed a motion requesting an extension of time to file a response. The City was granted an extension until January 28, 2008. In the interim, however, on January 24, 2008, the City filed a Consolidated Motion to Dismiss Appeals for Mootness in *Fumo* and *City Council*, seeking dismissal based upon the City's issu-

14. In its Reply Brief and Answer filed in *Fumo* on December 28, 2007, at 207 EM 2007, the City noted that the General Assembly supplemented its authority under Act 321 by passing Act No. 261 of May 29, 1913, which authorized the City by ordinance to regulate and determine the license fees for the license and approval required under Act 321. By Ordinance of July 8, 1915, the City enacted legislation regulating and determining the fees for licenses or permits in the Department of Wharves, Docks and Ferries. The City's 1915 ordinance, as amended, is presently codified in Section 18-803 of the Philadelphia Code, which was applied by Commerce Director Naidoff to HSP's license in her November 27, 2007 decision.

ance, on that same date, of its self-styled Notice of Revocation of License Issued in Error. In its motion, the City stated that the revocation was not based upon a belief that the City lacked the authority to issue such a license. On February 11, 2008, this Court entered an order denying the City's motion to dismiss.

On February 1, 2008, the City filed a "Consolidated Brief in Response to HSP's Applications for Summary Relief and Application for Ancillary Relief and a Stay" in the legislators' appeals at 207 and 208 EM 2007. In this pleading, the City comprehensively addressed its position that the General Assembly had specifically delegated the authority to issue submerged lands licenses to the City pursuant to Act 321, although the City repeated its contention that the legislators' appeals were rendered moot following the January 24th revocation notice.

On February 22, 2008, HSP filed the instant appeal at 28 EM 2008 from the City's revocation notice. On March 7, 2008, the City filed a "Consolidated Brief in Opposition to HSP Gaming, L.P.'s Petition for Review, Application for Summary Relief, and Application for a Stay Pursuant to Pa.R.A.P. 1781." In this filing, the City espouses a legal position that it acknowledges is different from the position it had twice taken previously. The City now cites two intervening enactments by the General Assembly passed on February 22, 2008, during the pendency of this litigation. *See* 2008 Pa. Legis. Serv. Act 2008–4 (H.B.1621); 2008 Pa. Legis. Serv. Act 2008–5 (H.B. No. 1627). The City says that this legislation was proposed "in direct response to the City's issuance of the riparian license to HSP." The City asserts that the legislation makes clear the current General Assembly's view that the General Assembly must specifically approve any license to use the Commonwealth's submerged land in the Delaware River. The City thereby suggests that it had, and presently has, no authority to issue submerged lands licenses under Act 321, while arguing, in the alternative, that the revocation notice should be upheld if this Court were to determine that the City did retain such authority. The question of the vitality of the authority

conferred in Act 321 is thus properly and fully joined in this appeal.

The issue of the City's authority under Act 321 is a matter of statutory construction. Act 321 was passed before enactment of the Statutory Construction Act of 1972 ("SCA"), 1 Pa.C.S. § 1501 et seq., or the predecessor Statutory Construction Act of 1937.[15] However, the subsequent enactments which are cited as having removed or reduced the City's authority—*i.e.*, the 1978 Dam Safety Act, as amended by the 1979 Dam Safety and Encroachments Act, *see* 32 P.S. § 693.1 et seq., and the two recent enactments awarding riparian leases along the Delaware River to other entities, *see* 2008 Pa. Legis. Serv. Act 2008-4 (H.B.1621); 2008 Pa. Legis. Serv. Act 2008-5 (H.B.1627), are subject to the SCA. With respect to Act 321 of 1907, the only question is what power that statute purported to confer upon Philadelphia relevant to issuing submerged lands licenses. That question is resolvable by looking to the plain language of the statute. Prior to enactment of a comprehensive statute specifically devoted to statutory interpretation, of course, it was well-established that courts should look first to the plain language of a statute to ascertain legislative intent. *See, e.g., Fox's Appeal*, 112 Pa. 337, 4 A. 149, 152 (1886); *Phila. & Erie R.R. Co. v. Catawissa R.R. Co.*, 53 Pa. 20, 1866 WL 6283, at *35 (Pa.1866).

With respect to the later enactments argued in this appeal, the SCA controls. In *HSP Gaming, L.P. v. City Council*, 595 Pa. 508, 939 A.2d 273 (2007), *reargument denied* (Dec. 31, 2007), we summarized the basic, relevant principles of construction as follows:

> Under the SCA, it is fundamental that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly[,] and that [e]very statute shall be construed, if possible, to give effect to all of its provisions." 1 Pa.C.S. § 1921(a). In this regard, the SCA instructs that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it

**15.** Act of May 28, 1937, P.L. 1019, formerly codified at 46 P.S. § 501 et seq.

is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). When, however, the words of a statute are not explicit, the General Assembly's intent is to be ascertained by considering matters other than statutory language. 1 Pa.C.S. § 1921(c).

The SCA provides that "[w]ords and phrases shall be construed according [to] the rules of grammar and according to their common and approved usage[.]" 1 Pa.C.S. § 1903(a). If the General Assembly defines words that are used in a statute, those definitions are binding. *Commonwealth v. Kimmel*, 523 Pa. 107, 565 A.2d 426, 428 (1989). Under the SCA, a court may presume that the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable; does not intend to violate the Constitution of the United States or that of Pennsylvania; and intends the entire statute to be certain and effective. 1 Pa.C.S. § 1922(1)-(3).

939 A.2d at 279–80.

■ In this case, the plain and unambiguous language of Act 321 makes clear that the General Assembly delegated power to the City to issue submerged lands licenses. Moreover, it is equally clear, by application of fundamental precepts of statutory construction, that no intervening Act removed that power, nor did the General Assembly's recent expression during the pendency of this litigation operate to undo the authority the City enjoyed when it acted in November of 2007.

On June 8, 1907, the General Assembly enacted several statutes addressing riparian law in Pennsylvania. The Acts, which were numbered 318, 321, 322, and 323, abolished the Board of Wardens of the Port of Philadelphia. The Acts divided the functions of the Board of Wardens between two separate bodies-the Board of Commissioners of Navigation [16] and the Philadelphia Department of Wharves, Docks, and Ferries. Act 322 authorized the Board of Commissioners of Navigation to regulate the use of the Delaware River, except

---

**16.** The Board of Commissioners of Navigation was the predecessor of the Navigation Commission, which was created by the Act of June 21, 1937, P.L. 1960.

for that portion of the River within Philadelphia—which was to be regulated by the City's Department of Wharves, Docks and Ferries pursuant to Act 321.

Act 321 specifically authorized the director of the City's Department of Wharves, Docks and Ferries to issue licenses permitting encroachments on the waterways and construction on submerged lands. The Act continued a long tradition of delegating to Philadelphia control over the Delaware River waterfront within the City.[17] Act 321 required the director of the Department of Wharves, Docks and Ferries to conduct a hearing on any application for such licenses after publication of notice, and directed that the license "shall not be unreasonably withheld." 53 P.S. § 14199. By Act 261 of May 29, 1913, the General Assembly supplemented the City's authority by authorizing the City, by ordinance, to regulate and determine the license fees for the license and approval required under Act 321. *Id.*

By Ordinance of July 8, 1915, the City enacted legislation regulating and determining the fees for licenses or permits issued by the Department of Wharves, Docks and Ferries. The 1915 ordinance, which was amended in 1940 and 1949, was later codified in Section 18–803 of the Philadelphia Code. Pursuant to the 1951 Home Rule Charter, Section A–101, the responsibilities of the Department of Wharves, Docks and Ferries were vested in the Department of Commerce.

In 1929, the General Assembly enacted the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, which provided, as a general rule, that no department or commission could grant an interest in any Commonwealth land without specific authority from the General Assembly. The Code provided:

17. The local authority vested in the City of Philadelphia to license the use of riparian lands in the Delaware River originated with the 1701 Charter of William Penn, and has been affirmed consistently by acts of Provincial and General Assemblies since that time. In *Kusenberg v. Browne*, 42 Pa. 173 (1862), this Court discussed the development of the City of Philadelphia's authority over the centuries. The decision provides a comprehensive historical perspective of the City's unique authority.

Except as otherwise in this act expressly provided, a department, board, or commission, shall not sell or exchange any real estate belonging to the Commonwealth, or grant any easement, right of way, or other interest over or in such real estate, without specific authority from the General Assembly so to do. . . .

71 P.S. § 194(a).

The authority of the City's Department of Commerce to issue submerged lands licenses under Act 321—which follows inexorably from the above legislative construct—was recognized and addressed by the Office of the Attorney General in Official Opinion No. 78–19, issued on August 21, 1978. The Office of Attorney General stated as follows:

You have asked for a clarification of our official opinion no. 77–20 water obstruction permits, dated December 30, 1977, in the light of the authority of the Navigation Commission for the Delaware River and its navigable tributaries and the Director of Commerce for the City of Philadelphia to grant licenses for the construction of facilities in the Delaware and Schuylkill Rivers below the low-water mark.

Opinion no. 77–20 stated that an applicant for a water obstruction permit for facilities extending below the low-water mark of a navigable river or stream must first obtain an easement or other interest in the submerged land below the low-water mark. This legal interest is necessary because the Commonwealth is the owner of the bed of navigable rivers and streams below the low-water mark. Since existing law requires that specific authority must be obtained from the General Assembly for the grant of such an interest, the opinion pointed out that the applicant must obtain such an interest from the General Assembly by a duly enacted statute.

The question you have raised is whether, with respect to the Delaware and Schuylkill Rivers, the General Assembly has not already provided specifically for the conveyance of an interest in the submerged land to anyone desirous of constructing facilities extending below the low-water mark in those rivers.

It is our opinion, and you are advised, that the statutes enacted by the Pennsylvania General Assembly for the creation of the Navigation Commission for the Delaware River and its navigable tributaries and the Director of Commerce of the City of Philadelphia empowered those bodies to grant an interest in the river bed (a license) for the construction of facilities below the low-water mark of the Delaware and Schuylkill Rivers.

Attorney General's Official Opinion No. 78–19, *Construction Along Delaware and Schuylkill Rivers,* 8 Pa. D. & C.3d 438, 439–40 (1978).

The Opinion further stated that

[I]t is our view that anyone desiring to construct, alter or extend facilities into the Delaware and Schuylkill Rivers need not seek from the General Assembly a statute authorizing the grant of an interest in the submerged land on which the construction is to be done inasmuch as the General Assembly has already authorized, by statutes, the Director of Commerce of the City of Philadelphia, for those portions of the river within the City of Philadelphia, and the Navigation Commission for the Delaware River and its navigable tributaries, for portions outside of Philadelphia, to grant the required interest in the river bed.

*Id.* at 446–47. Of course, the Opinion of the Attorney General does not control the question of statutory construction presented to this Court. Statutory construction is peculiarly the function of the Judiciary. We cite the Attorney General's view only because it is consistent with the plain language of the statutory construct, at the time the Opinion was rendered.

In 1978, the General Assembly enacted the Dam Safety Act, Act No. 325 of November 26, 1978, P.L. 1375, 32 P.S. § 693.1 et seq. The Dam Safety Act specifically repealed those provisions of Act 322 relating to the authority of the Navigation Commission to issue licenses for submerged lands along the Delaware River outside of Philadelphia. The repealer and savings clause reads as follows:

(a) The following acts and parts of acts and supplements thereto are hereby repealed absolutely:

The act of March 23, 1803 (P.L. 389, No. 140), entitled "An act to authorize any person or persons owning lands adjoining navigable streams of water, declared public highways, to erect dams upon such streams, for mills and other water-works."

**Sections 7 and 8 of the act of June 8, 1907 (P.L. 496, No. 322),** entitled "An act to establish a Board of Commissioners of Navigation for the river Delaware and its navigable tributaries; regulating their jurisdiction over ships, vessels, and boats, and wharves, piers, bulkheads, docks, slips, and basins; and exempting cities of the first class from certain of its provisions; and making an appropriation therefor."

The act of June 25, 1913 (P.L. 555, No 355), entitled "An act providing for the regulation of dams, or other structures or obstructions, as defined herein, in, along, across, or projecting into all streams and bodies of water wholly or partly within, or forming part of the boundary of, this Commonwealth; vesting certain powers and duties in the Water Supply Commission of Pennsylvania, for this purpose; and providing penalties for the violation of the provisions hereof."

(b) All other acts or parts of acts inconsistent herewith are hereby repealed to the extent of such inconsistency.

(c) The provisions of this act shall not effect [sic] any suit, prosecution, or order instituted to enforce any right or abate any violation of any act or part thereof repealed by this act.

32 P.S. § 693.27 (emphasis added) (footnotes deleted).[18] Notably, the Dam Safety Act did not displace Act 322 in its entirety, but rather, repealed only Sections 7 and 8. More

18. In 1979, the General Assembly amended the Dam Safety Act, and titled the amended act "the Dam Safety and Encroachments Act." *See* Act 70 of Oct. 23, 1979, P.L. 204, *as amended,* 32 P.S. § 693.1 et seq. The repealer provision above, as well the provision governing "Permit requirement," 32 P.S. § 693.6, which we discuss *infra*, were part of the original Dam Safety Act.

significantly for purposes of the dispute *sub judice,* the Dam Safety Act did not expressly purport to repeal **any** of the provisions of Act 321, the separate Act governing riparian issues in Philadelphia. Thus, while the Dam Safety Act altered the regulatory structure for the Delaware River abutting Delaware and Bucks Counties, it did not, by its terms, affect the General Assembly's existing, specific grant of authority to the City under Act 321.

Since the Dam Safety Act's repealer provision contains no express repeal of Act 321, the City's delegated authority presumptively survived—unless there was a repeal of that authority by implication under the general repealer found in 32 P.S. § 693.27(b). "[E]ven where there is an express repeal in the later legislation of all acts inconsistent therewith, such provision is considered as an express recognition that those not inconsistent therewith remain in force." *Commonwealth ex rel. Matthews v. Lomas,* 302 Pa. 97, 153 A. 124, 127 (1930) (citing *Commonwealth ex rel. Womer v. Reese,* 293 Pa. 398, 143 A. 127 (1928)).

The well-established principles regarding implied repealer have been incorporated into the SCA. Section 1971 of the SCA (relating to implied repealer by later statute) states:

(a) Whenever a statute purports to be a revision of all statutes upon a particular subject, or sets up a general or exclusive system covering the entire subject matter of a former statute and is intended as a substitute for such former statute, such statute shall be construed to supply and therefore to repeal all former statutes upon the same subject.

(b) Whenever a general statute purports to establish a uniform and mandatory system covering a class of subjects, such statute shall be construed to supply and therefore to repeal pre-existing local or special statutes on the same class of subjects.

(c) In all other cases, a later statute shall not be construed to supply or repeal an earlier statute unless the two statutes are irreconcilable.

1 Pa.C.S. § 1971. The Dissenting Opinions advert to the "inconsistency" they perceive between the Dam Safety Act and Act 321, which implicates both the general repealer and subsection (c) of the SCA.

The question of whether a statute has been impliedly repealed by a later statute is exclusively a question of legislative intent. *Kelly v. City of Philadelphia*, 382 Pa. 459, 115 A.2d 238, 244 (1955). "Repeals by implication are not favored and will not be implied unless there be an irreconcilable conflict between statutes embracing the same subject matter." *Id.* "Furthermore, '[b]ecause implied repeals are not favored in the law, the legislative intent to repeal a statute by enacting another must be clearly shown.'" *Pa. Indus. for Blind & Handicapped v. State Sys. of Higher Educ.*, 87 Pa.Cmwlth. 1, 485 A.2d 1233, 1234 (1985). The reason for such a restriction is obvious: absent irreconcilability, a judicial finding of implied repeal would essentially rewrite the legislation.

In *Pennsylvania Turnpike Commission v. Sanders & Thomas, Inc.*, 461 Pa. 420, 336 A.2d 609 (1975), this Court addressed the issue of whether the Arbitration Act of 1927 was impliedly repealed by the enactment of the Arbitration of Claims Act of 1937 for resolving disputes between the Commonwealth and contractors. The Court observed that, "as a general rule, 'a later statute shall not be construed to supply or repeal an earlier statute unless the two statutes are irreconcilable.' These considerations are particularly significant in a case such as this, involving two statutes which for decades have coexisted without apparent conflict or confusion." 336 A.2d at 614 (footnote omitted).

The Court further stated that "[t]here may, indeed, be an implied repeal of a legislative enactment. But it can arise only where the language used in the later statute necessarily discloses an irreconcilable repugnancy between its provisions and those of the earlier statute so inconsistent as to not admit of any fair consonant construction of the two." 336 A.2d at 614 n. 10.

In determining that the latter act did not impliedly repeal the former act, Justice Pomeroy, writing for the unanimous *Sanders & Thomas* Court, reasoned as follows:

> Section 4 of the Act of 1937 does not provide that the jurisdiction of the Board of Arbitration of Claims shall be exclusive, nor does it expressly proscribe arbitration under the Act of 1927. Indeed, the Act of 1937 makes no reference to the earlier statute. **There is nothing inherently inconsistent in the existence of two distinct statutory procedures for the resolution of the same disputes, even though the result may be a lack of symmetry in the area.** ... Although the procedures established by the two statutes before us differ in a number of respects, they are not repugnant one to the other. **In the absence of a clear indication, either express or implied, of legislative intent that the Act of 1937 shall apply to all those cases it covers to the exclusion of the Act of 1927, we must assume that it was the intention of the legislature that the procedures embodied in the two acts are to stand together, providing alternate and discrete methods of dispute resolution for the Commonwealth and those who contract with it.** Thus, we hold that Section 16 of the Act of 1927 has not been repealed by implication by Section 4 of the Act of 1937.

336 A.2d at 64 (emphasis added).

 The fact that the Dam Safety Act included a generic general repealer (beyond the principle of implied repeal always available under the SCA) does not provide any added weight in favor of finding an implied repeal of the never-mentioned Act 321. As the Commonwealth Court has noted, "a general repealing clause is not typically considered an implied repeal because it does not declare what the inconsistency is, but rather, it simply limits any implied repeal to only those acts that are inconsistent. Consequently, a general repealing clause is, in many ways, an express limitation on the ability to find implied repeal." *Mech. Contractors Ass'n v. Commonwealth,* 860 A.2d 1145, 1153 n. 16 (Pa.Cmwlth.2004), *aff'd in part, reversed in part, and remanded,* 594 Pa. 224, 934

A.2d 1262 (2007). *Commonwealth v. Meyers,* 290 Pa. 573, 139 A. 374 (1927) addressed general repealing clauses and noted the same logical point:

> [W]e may say that a general repealing clause does nothing more than state what would be the effect of the statute without such a clause. All inconsistent acts or parts of acts would be repealed by implication. But, unless there is an actual inconsistency, the prior act is not repealed.

139 A. at 379.

Given the mutually exclusive territorial limitations in Acts 321 and 322, which co-existed for many years, the General Assembly no doubt was well aware, in enacting the Dam Safety Act, of the specific delegation of authority to the City in Act 321. And yet, the General Assembly did not purport to identify and repeal any portion of Act 321. Moreover, the Legislature did not even repeal and displace Act 322 in its entirety. Thus, while Sections 7 and 8 of Act 322 were repealed, other provisions of Act 322, unrelated to encroachments into navigable waterways, remained. It would be incongruous to interpret the Dam Safety Act as explicitly repealing Sections 7 and 8 of Act 322 and leaving intact the remainder of that Act, but intending to implicitly repeal Section 10 of Act 321 via the general repealer clause.

Furthermore, it is not difficult to reconcile the Dam Safety Act (and its effect upon Act 322) with Act 321—just as Act 321 could be reconciled with Act 322, before the Dam Safety Act repealed a part of it. There is no irreconcilable repugnancy between the provisions of the Dam Safety Act and Act 321, which was always specific to Philadelphia. It is perfectly logical for the Legislature to treat different areas of the Commonwealth differently, and to leave intact the licensing authority specific to Philadelphia. Indeed, the General Assembly routinely makes distinctions between political subdivisions based upon their size, location, and perceived special needs. For some perceived problems, it may be logical and sensible to have a one-size-fits-all legislative scheme. But the issue before us is not to identify and approve the best of legislative schemes. The question is irreconcilability for pur-

poses of implying an expression of legislative intent to repeal that which the Legislature did not undertake to repeal expressly. In our judgment, a finding of implied repeal here would be in derogation of not only the well-established principles governing implied repeals, but also of the General Assembly's specific, express grant of authority to the City of Philadelphia to issue submerged lands licenses.

Although we ultimately are not persuaded by the contrary construction offered by the Dissenting Opinions, their view may well be deemed a plausible one supported by resort to other factors. But, in this arena at least—*i.e.*, where implied repeals are disfavored and the implication properly arises only from irreconcilability—if the question is close and debatable, the resolution must favor a finding that no repeal was implied. And, in this analysis requiring reconciliation where possible, we respectfully disagree with Mr. Justice McCaffery's suggestion that the scope of the Dam Safety Act and the general repealer provision compels but one conclusion. This Court has noted that, "[n]o legal system dependent upon the salutary assumption that persons know the law could persist absent a concomitant assumption that those who are inclined to find the law are capable of doing so according to general, easily found, and clear principles of construction." *Commonwealth v. Magliocco*, 584 Pa. 244, 883 A.2d 479, 488–89 (2005). Finding an implied repealer here requires quite a high degree of investigation and sophistication.

Moreover, the suggestion of implied repeal premised upon a perceived overarching, statewide licensing role for the DEP does not survive closer scrutiny of what an implied repeal would achieve. Pursuant to Section 15 of the Dam Safety Act, 32 P.S. § 693.15, the DEP's authority to issue submerged lands licenses is limited in scope. Thus, Section 15 designates the DEP as the executive agency with the authority to issue submerged lands licenses for projects of 25 acres or less that meet certain enumerated public purposes, as follows:

**§ 693.15. Projects affecting submerged lands of the Commonwealth**

(a) No permit shall be granted pursuant to this act for any project to occupy submerged lands of the Commonwealth in any navigable lake or river or stream declared a public highway, unless the applicant has obtained an easement, right-of-way, license or lease pursuant to this act, or holds an estate or interest in such submerged lands pursuant to other specific authority from the General Assembly.

(b) The department may, with the approval of the Governor, grant an easement, right-of-way, license or lease to occupy submerged lands of the Commonwealth in any navigable lake or river or stream declared a public highway, for any dam, water obstruction or encroachment which is constructed for the purpose of:

(1) improving navigation or public transportation;

(2) recreation, fishing or other public trust purposes;

(3) protecting public safety or the environment;

(4) providing water supply, energy production or waste treatment;

(5) providing a public utility service by a government agency or subdivision or public utility or electric cooperative; or

(6) other activities which require access to water.

Such easement, right-of-way, lease or license shall provide for the payment to the Commonwealth of compensation for the use of its property in such amount and shall be subject to such terms and conditions as the department shall, with the approval of the Governor, prescribe.

(c) The total area of land which any such project may occupy under one or more easements, rights-of-way, licenses or leases granted by the department pursuant to this section shall not exceed 25 acres.

(d) No easement, right-of-way, lease or license may be granted under this section which may adversely affect navigation or significantly impair the public's right in lands held in trust by the Commonwealth.

(e) No title, easement, right-of-way or other interest in submerged lands or other real estate of the Commonwealth

may be granted except as expressly provided by this section or other specific authority from the General Assembly. 32 P.S. § 693.15.[19]

In the Brief for Amicus Curiae filed in *Fumo v. City of Philadelphia*, the DEP stated that the appeal from the City's issuance of the submerged lands license to HSP "disputes the authorization to occupy submerged lands on one site on the Delaware River in Philadelphia, **for a project that does not fall within the scope of the Department's Submerged Lands License Program.**"[20] Brief for Amicus Curiae at 5 (emphasis added). Nevertheless, the DEP offered that it "has concluded that the SugarHouse casino project as currently proposed, which is at the heart of this appeal, would not meet the criteria for DEP to issue a submerged license under Section 15(b) and (c)." *Id.* at 9 n. 4. Thus, the DEP (the presumed statewide entity responsible for overseeing a unitary statewide regulatory scheme) appears to read the statutory construct as not reposing exclusive licensing authority within the DEP. Given that implied repealers are disfavored, the fact that the relevant state agency is not asserting exclusive authority under the Dam Safety Act supports a finding that there was no intention to repeal Act 321.

The statutory construct, in short, appears to be nuanced, not monolithic, and this weighs in favor of the conclusion that no implied repeal, affecting what had always been a power particularly reserved for that portion of the Delaware River in Philadelphia, was clearly intended. It is not inherently inconsistent for the General Assembly to delegate authority to the

**19.** The issuance of a submerged lands license pursuant to Act 321 is "pursuant to other specific authority from the General Assembly," as referred to in subsection (a) of § 693.15.

**20.** The DEP indicated that it had filed its Amicus Curiae Brief because of the state legislators' "omission of any reference to DEP's statutory submerged lands licensing program." The DEP further stated that, "[a]lthough it is not directly at issue in this appeal, DEP urges this honorable Court to recognize and preserve the existing DEP Submerged Lands License Program authorized by the Dam Safety Act." Brief for Amicus Curiae at 5. Nothing in this Court's decision affects the DEP's existing authority under the Dam Safety Act, as well as the limitations upon that authority set forth in Section 15(b) and (c).

DEP to review projects meeting certain statutory require-ments, while maintaining the General Assembly's specific dele-gation of authority to a political subdivision, such as the City under Act 321. We deem the absence of an express repeal of the City's authority under Act 321 to be a reflection that the General Assembly intended that its settled, existing delegation of authority to the City remain intact.[21]

We find further support for our holding in Section 6 of the Dam Safety Act, 32 P.S. § 693.6, which discusses the permit-ting authority the Act provided to the DEP.[22] It is notable that, like the general repealer in Section 693.27, the permit-ting provisions refer to Act 322 (and Act 355 of 1913), but never to Act 321.[23] This construct suggests, once again, that the Dam Safety Act did not purport to address the distinct, existing construct in Philadelphia. Section 693.6 provides as follows:

(a) No person shall construct, maintain, modify, enlarge or abandon any dam, water obstruction or encroachment with-out the prior written permit of the department.

(b) Any existing dam, water obstruction or encroachment constructed pursuant to a **license or permit issued in compliance with the provisions of the act of June 8, 1907 (P.L. 496, No. 322),** entitled "An act to establish a Board of Commissioners of Navigation for the river Delaware and its navigable tributaries; regulating their jurisdiction over ships, vessels, and boars, and wharves, piers, bulkheads,

21. Mr. Justice McCaffery supports his argument for implied repealer in part by noting the instances where the General Assembly has undertak-en to grant leases in riparian lands within Philadelphia. (Those instanc-es are gathered in the state legislators' Brief filed in 207 EM 2007.) But, as we understand the argument of HSP (and of the City initially), the power granted to the City did not purport to excise coordinate powers in the Commonwealth (including the General Assembly). Moreover, there is nothing in the nature of the power that would command a finding that only one entity could act.

22. Section 9 of the Act grants DEP "the power to grant a permit" if a project complies with the Dam Safety Act. 32 P.S. § 693.9.

23. Act 355, formerly codified at 55 P.S. § 291 et seq., excepted the tidal waters of the Delaware River and its navigable tributaries from the permitting process contemplated thereunder, and has not been a focus of the parties in this appeal.

docks, slips and basins; and exempting cities of the first class from certain of its provisions; and making an appropriation therefor," or the act of June 25, 1913 (P.L. 555, No. 355), entitled "An act providing for the regulation of dams, or other structures or obstruction, as defined herein, in, along, across, or projecting into all streams and bodies of water wholly or partly within, or forming part of the boundary of, this Commonwealth; vesting certain powers and duties in the Water Supply Commission of Pennsylvania, for this purpose; and providing penalties for the violation of the provisions hereof," shall be deemed to comply with the construction and operating permit requirements of this section. All such projects shall hereafter comply with the operating, maintenance, monitoring and other requirements of this act.

(c) The owner of any existing dam, water obstruction or encroachment who does not hold a permit issued pursuant to the act of June 8, 1907 (P.L. 496, No. 322), or the act of June 25, 1913 (P.L. 555, No. 355) shall apply for and receive a permit pursuant to this act on or before January 1, 1981. After the effective date of this act, all such projects shall comply with the operating, maintenance, monitoring and other requirements of this act.

(d) Any permit issued by the department after the effective date of this act for the construction and operation of a water obstruction or encroachment shall incorporate authorization for normal repairs and maintenance of permitted structures conducted within the original specifications for the water obstruction or encroachment from its original specifications and any repairs or reconstruction involving a substantial portion of the structure, shall require the prior written permit of the department pursuant to subsection (a).

32 P.S. § 693.6 (footnotes omitted) (emphasis added). Subsections (a) and (d) are forward-looking, while subsections (b) and (c) speak to "existing" dams, water obstructions or encroachments. Subsection (b) governs those structures that were constructed pursuant to a permit under Act 322 or Act 355,

while subsection (c) governs those structures, subject to the same Acts, where the owner does not hold a permit.

Section 693.6 is significant because it addresses the practical effect of the new legislative scheme upon existing dams, water obstructions or encroachments that either were permitted or licensed, or were subject to permitting or licensure, under Act 322 or Act 355. The provisions essentially "grandfathered" in such existing structures (whether permitted or licensed or not), but mandated (1) that those without a permit must apply for (and will automatically receive) one, and (2) that, going forward, all such "projects" must comply with the Dam Act's operating, maintenance, monitoring and other requirements.

Again, the permit requirement of Section 6 does not refer to licenses or permits subject to, or issued in compliance with, Act 321. We cannot assume that the absence of any such reference was a result of ignorance or mere oversight by the General Assembly. As is, it is reflective of, and consistent with, the General Assembly's intention not to repeal Act 321 when the Dam Safety Act was passed. The permit requirement provision, which never referred to Act 321, did not eviscerate Act 321.

The City's latest position says that the two statutes passed by the General Assembly on February 22, 2008, which granted submerged lands licenses to property owners for residential developments in the City of Philadelphia, change matters.[24] We cannot agree.

Pursuant to those February 22 Acts, the General Assembly authorized and directed the Department of General Services, with the concurrence of the Department of Environmental Protection, to enter into the following leases, one with VTE Philadelphia, L.P., and one with NCCB Associates, L.P., or their nominees: "for an initial term of 99 years, land within the bed of the Delaware River in the City of Philadelphia, and to extend the period for all or any portion of the leased premises for an additional term of up to 99 years." The Acts

24. City Council and Councilman DiCicco submitted copies of the two statutes as Exhibit B to their Application to Intervene filed in this matter.

provided that "[t]he lease shall grant the lessee, and all successors, assigns and sublesses, the right to use the above-described premises, or to assign the lease or sublease or permit the sublease of the above-described premises for the proposed development of one residential tower with accessory parking garage and restaurant, as well as marina and maritime uses all consistent with public access." The Acts further provided that "[a]ll leases authorized or referred to under this section shall be made under and subject to the condition, which shall be contained in the lease documents, that no portion of the parcels shall be used as a licensed facility as defined in 4 Pa.C.S. § 1103 ..." of the Gaming Act. The leases authorized under the Acts would be subject to immediate termination "should any portion of any parcel be used" for that purpose.

Section 2 of each of the Acts included an identical "Affirmation of exclusive authority of General Assembly," which stated that: "[t]he General Assembly hereby affirms its existing, sole and exclusive authority to consider and specifically authorize the conveyance of any title, easement, right-of-way or other interest in Commonwealth-owned lands...." As the City notes, this provision obviously was included with an eye to the pending litigation in this Court concerning HSP's submerged lands license. Notably, in his signing statement approving the statutes, Governor Edward G. Rendell addressed the legislative "affirmation," and the pending litigation, as follows:

[T]he issue of whether local governments—in this instance, the City of Philadelphia—also have some authority to grant riparian rights along waterways abutting their boundaries is currently the subject of litigation pending before the Pennsylvania Supreme Court. As a result, I think it is unwise for any of us to articulate a position regarding this subject. Consequently, my signature on these bills should not be viewed as my support for or against this position. Rather, I am signing the bills, as mentioned above, in order to move the underlying projects forward expeditiously.

Governor's Signing Statement at 1.[25]

Of course, the proper interpretation of statutory provisions for purposes of resolving a controversy brought before the courts is a matter entrusted to the Judiciary. Moreover, the statement of a later legislative body, concerning the intended meaning and scope of an enactment passed by legislative predecessors, is entitled to no particular deference-particularly when the legislation at issue is over a century old (in the case of Act 321) or three decades old (as in the case of the Dam Safety Act and its amendment). The current legislative declaration is even less persuasive since it appears that it was intended, at least in part, to influence the decision in pending appeals, including an appeal brought by individual members of the Legislature.

"[I]t is elementary that the legislature cannot create authority retroactively simply by passing 'clarifying' legislation. The intent of the legislature must be determined as of the time the original act was passed." *St. Joseph Lead Co. v. Potter Twp.*, 398 Pa. 361, 157 A.2d 638, 642 (1959). Furthermore, in *Sphere Drake Insurance Co. v. Philadelphia Gas Works*, 566 Pa. 541, 782 A.2d 510, 517 (2001), this Court stated that the plain language of the statute and statutory construct that existed when legislation was enacted are controlling, quoting U.S. Supreme Court Justice Scalia's observation that "[a]rguments based on subsequent legislative history, like arguments based on antecedent futurity, should not be taken seriously, not even in a footnote." Notably, the General Assembly did not purport to repeal Act 321, much less did it purport to repeal the provision and make that repeal have a global retroactive effect. Of course, the General Assembly may react to litigation or to court decisions and change the law going forward. But the General Assembly cannot arrogate the authority of the Judiciary to interpret legislation to control the outcome of cases pending before the courts. Thus, the 2008 legislative enactments, whatever their intent, simply

25. Governor Rendell's signing statement has been submitted by HSP as Exhibit A to its Answer in Opposition to the Application for Leave to Intervene filed by City Council and Councilman DiCicco in this matter.

have no effect on this Court's interpretation of the meaning and vitality of the never-repealed Act 321 at the time the City acted upon it, in November of 2007. Accordingly, we conclude that the City was correct when it asserted originally that the Commerce Director plainly had the power under Act 321 to authorize issuance of the submerged lands license on November 27, 2007.

We next turn to the issue of whether the City's January 24, 2008 Notice of Revocation of License Issued in Error was valid. For the following reasons, we conclude that the revocation notice was invalid.

In its Petition for Review, HSP asserts that the revocation notice was void *ab initio* because: (1) it was issued while appeals from Commerce Director Naidoff's November 27, 2007 decision were pending before this Court; (2) the doctrine of estoppel prohibits the City from reversing its position supporting the issuance of the license and that the City had the authority to issue the license; (3) the revocation notice is unreasonable and an abuse of discretion as it was based on grounds extraneous to Act 321, and there is no evidence that Commerce Director Naidoff issued the license in error; and (4) even assuming, arguendo, that the license was issued in error, HSP has a vested right in the license.

Respecting its revocation notice, the City asserts that, under Act 321, it had the power to revoke the license in its discretion. The City argues that support for its proposition that the license issued to HSP is revocable may be found in an excerpt from the Attorney General's Official Opinion No. 78–19, *supra*, because the Office of Attorney General described the license as "revocable:"

> It is our view that the General Assembly did not intend in these various statutes that title or any interest beyond a simple revocable license be granted to the applicant by the Director of Commerce or Navigation Commission to whom was delegated that authority by the General Assembly.

8 Pa. D. & C.3d at 446. As noted previously, the Attorney General's Official Opinion addressed whether the existing

statutory construct empowered the Navigation Commission and the City of Philadelphia's Director of Commerce to grant licenses for the construction of facilities below the low-water mark of the Delaware and Schuylkill Rivers.

We do not believe that the Attorney General's Opinion supports the City's assumption of a broad power of revocation. The excerpt cited by the City must be examined in the context of the issue addressed by the Attorney General, as well as the statement that immediately precedes the excerpt:

> It is therefore our opinion that the requirement in the various statutes, including those currently directed to the Director of Commerce for the City of Philadelphia and the Navigation Commission for the Delaware River and its navigable tributaries for the production of evidence of ownership of the ground involved refers to the riparian land and not the river bed below the low-water mark. **It is our view that the General Assembly did not intend in these various statutes that title or any interest beyond a simple revocable license be granted to the applicant by the Director of Commerce or Navigation Commission to whom was delegated that authority by the General Assembly.**

*Id.* at 446 (emphasis added).

The City construes the Attorney General's phrasing out of context. As the context reveals, the Attorney General was contrasting the license authorized by the Act with other, greater property interests. The Attorney General's Opinion stated that the licensing procedure before the City's Director of Commerce authorizes the construction of obstructions below the low-water mark by a riparian land owner, and that "[i]t is the riparian right of the owner in conjunction with a license that legalizes the existence of an obstruction." 8 Pa. D. & C.3d at 444 (citing *Philadelphia v. Commonwealth*, 284 Pa. 225, 130 A. 491 (1925)). The Attorney General observed that "historically no interest greater than a license has been intended to pass to riparian owners along the Delaware River and its navigable tributaries for construction of obstructions below the low-water mark." *Id.* Viewed in context, we under-

stand the modifier "revocable" to be a recognition that no authority existed to award a permanent property interest in the riverbed.

In any event, even if the Attorney General's Official Opinion could be construed to support the City's argument that it has some power of revocation, the Opinion would be persuasive only to the extent it was grounded in some existing authority recognizing that power. Presumably, an authority issuing a license could condition its issuance, and even reserve a power of revocation, or impose a temporal limitation. Notably, the City does not argue that the submerged lands license it issued in November of 2007 reserved a power of unilateral, unconditional, "discretionary" revocation. Nor has the City identified any provision of Act 321, of the Philadelphia Code, or of any other authority, that recognizes the broad power of revocation it insists upon.

For the City to prevail in the circumstance presented here, we would have to recognize a virtually unlimited power. In this case, the City purported to revoke the license after the licensing proceedings had been completed, the Director of Commerce had approved the issuance of the license, and after the period to file an appeal from the approval had passed. The revocation was issued after a reliance interest had arisen in favor of the licensee. The revocation also was issued after appeals had been filed from the Commerce Director's decision to issue the submerged lands license, while the appeals were pending, and it was issued without notice or a hearing. For purposes of decision, and as the record is replete with evidence of reliance, we are satisfied that the reliance interest alone was enough to render the purported revocation invalid.

In summary, Act 321 authorized the City to issue the license in this case. The duly authorized Director of Commerce determined that HSP had satisfied the requirements set forth in Act 321 and Phila. Code § 18–103, and concluded that the license should be issued to HSP. The Director of Commerce's Findings of Fact and Conclusions of Law are amply supported by the record of the proceedings before her—notwithstanding the different view of her successor. We recognize that there

has been a change in the executive office in Philadelphia; but the view of the current Director of Commerce for the City does not affect or undermine the legitimate exercise of the authority reposed in the former Director of Commerce.[26]

Based upon the foregoing, we conclude that the City's Department of Commerce had the authority under Act 321 to issue the November 27, 2007 submerged lands license to HSP, and that the City's January 24, 2008 "Notice of Revocation of License Issued in Error" was invalid. Accordingly, we hold that the license so issued is valid.

Madame Justice GREENSPAN did not participate in the consideration or decision of this matter.

Justice EAKIN and BAER and Justice TODD join the opinion.

Justice SAYLOR and McCAFFERY file dissenting opinions.

Justice SAYLOR, dissenting.

Because I believe that the City's relevant authority under Act 321 was extinguished by the general repealer clause of the Dam Safety and Encroachments Act of 1978—and indeed, never included within its scope encroachment into the Delaware River for facilities other than wharves, piers, and similar harbor structures—I would find that the City lacked the power to issue the disputed license in the first instance. Accordingly, I respectfully dissent.

To support its central argument that the City was authorized by the General Assembly to grant it a license to encroach into the Delaware River, HSP relies on Act 321 of 1907. As noted by the majority, however, shortly after the Attorney General issued his Opinion stating that the City retained such authority, the Legislature passed the Dam Safety and Encroachments Act of 1978 (the "Dam Safety Act").[1] In my

---

26. In light of our disposition, we need not address HSP's remaining arguments regarding the invalidity of the revocation notice.

1. Act of Nov. 26, 1978, P.L. 1375, No. 325 (as amended, 32 P.S. §§ 693.1–693.27).

opinion, that enactment had the effect of removing from the City any authority that it had as referenced in the Opinion of the Attorney General.

According to its express terms, the Dam Safety Act's purposes are to provide for state regulation of all water obstructions and encroachments in the Commonwealth in order to protect the health, safety, and welfare of the people and property; to protect the natural resources and environmental rights secured by the state Constitution and conserve the water quality, natural regime and carrying capacity of watercourses; and to assure proper planning, design, construction, maintenance, and monitoring of water obstructions and encroachments, in order to prevent unreasonable interference with water-flow and protect navigation. *See* 32 P.S. § 693.2. Its scope is broadly delineated to include "[a]ll water obstructions and encroachments ... located in, along, across or projecting into any watercourse, floodway or body of water, whether temporary or permanent," *id.*, § 693.4 (emphasis added); *see also id.*, § 693.3 (defining watercourse as any "channel of conveyance or surface water having a defined bed and banks ...."), and its state-level permitting requirements apply in an equally comprehensive fashion. *See id.*, 693.6(a) ("No person shall construct, operate, maintain, modify, enlarge or abandon any dam, water obstruction or encroachment without the prior written permit of the [Pennsylvania Department of Environmental Protection]."); *id.*, § 693.3 (defining water obstruction to include any pier, wharf, abutment or any other structure located in, along, across, or projecting into any watercourse). Thus, the General Assembly enacted the Dam Safety Act to provide for a uniform system by which encroachments into all waterways of the Commonwealth are to be overseen and regulated at the state level.

Indeed, the act was passed a mere three months after the issuance of the Opinion of the Attorney General, making it reasonable to suppose that it represented a reaction to that opinion designed to provide for a comprehensive state-wide system of regulation of water encroachments throughout the Commonwealth. Not only did it absolutely repeal Sections 7

and 8 of Act 322, *see* 32 P.S. § 693.27(a), it also expressly reserved to the Commonwealth the sole authority for the occupation of submerged lands:

> No title, easement, right-of-way or other interest in submerged lands or other real estate of the Commonwealth may be granted except as expressly provided by this section or other specific authority from the General Assembly.

32 P.S. § 693.15. This reservation of authority is consistent with the legislative objectives of the act as outlined above.

The majority observes that the Dam Safety Act repeals portions of Act 322 absolutely, but does not similarly repeal Act 321. The majority concludes from this that the Legislature intended to leave Act 321 completely unaffected. *See* Majority Opinion, *op.* at 157, 954 A.2d at 1179 ("We deem the absence of an express repeal of the City's authority under Act 321 to be a reflection that the General Assembly intended that its settled, existing delegation of authority to the City remain intact."). However, the general repealer clause contained in the Dam Safety Act states that "[a]ll other acts or parts of acts inconsistent herewith are hereby repealed to the extent of such inconsistency." 32 P.S. § 693.27(b). It seems evident (to me anyway) that Act 321 is inconsistent with Section 6(a) of the Dam Safety Act, at least to the extent Act 321 would otherwise allow the City unilaterally to license HSP to build out into the Delaware River beyond the low-water mark. *See id.*, § 693.6(a) (prohibiting any person from constructing, operating, maintaining, modifying, enlarging, or abandoning any water obstruction or encroachment without the prior written permission of the state Department of Environmental Protection). Therefore, Act 321 was nullified by the general repealer clause at least to this extent. The majority notes that, under the Dam Safety Act, Act 322 licensees (but not Act 321 licensees) may dispense with the Section 693(a) permit requirement. The majority concludes that this reflects a legislative intent not to "eviscerate" Act 321. *See* Majority Opinion, *op.* at 157–61, 954 A.2d at 1179–81. I do not agree, however, that this conclusion follows from the premise. Specifically, Section 693.6(a) requires all persons who "construct . . . any

... water obstruction or encroachment" anywhere in the Commonwealth to obtain a departmental permit, a precondition of which is that such person hold an interest in the subject property issued pursuant to either the Dam Safety Act, or some "other specific authority from the General Assembly." 32 P.S. 693.15(a). The mere fact that Act 322 licensees are deemed to already hold such a permit seems irrelevant to the question of whether Act 321 survived the Dam Safety Act, or otherwise constituted "other *specific* authority" from the General Assembly, such that Act 321 licensees would be eligible to receive a Section 693.6(a) permit. (On this point, moreover, I agree with Mr. Justice McCaffery that Act 321 is general, not specific, authority, as it does not designate any particular tract of land for licensing.)

This raises the question of why the Legislature did not elect to repeal Act 321 "absolutely," as it did parts of Act 322. The answer emerges upon a reading of the entirety of Act 321, which grants powers to the City that are unrelated to encroachments into navigable waterways. Section 9 of that statute, for example, authorizes the Director of Wharves, Docks, and Ferries (now the Director of Commerce) to acquire unimproved, but reclaimable, marshlands that lie wholly within the City "between the low-water line and the high-water shore-line of" such waterways. 53 P.S. 14197. The act also empowers the director to demand that the owners of harbor structures keep their facilities clean and free of obstructions— or, alternatively, to hire others to clean and clear them and charge the cost back to the owners. *See id.*, § 14196. There are also reporting requirements, and any number of other provisions in Act 321 that are beneficial in themselves and are entirely consistent with the Legislature's decision to repose all licensing and permitting power within the Commonwealth government for the building of encroachments into the river in the first instance. The General Assembly could reasonably have found it salutary to leave these measures in place by not repealing Act 321 *in toto*, but only to the extent of its inconsistency with the Dam Safety Act—a goal evidently accomplished through the wording of the general repealer clause. Hence, I do not share the majority's view that the

mere failure to expressly repeal Act 321 in the same manner as Act 322 evidences an intent to leave it completely unaffected. To the extent there is any doubt on this subject, moreover, it must be resolved against the existence of the City's authority to issue the license in question. *See Denbow v. Borough of Leetsdale*, 556 Pa. 567, 576–77, 729 A.2d 1113, 1118 (Pa.1999) ("Municipal corporations have no inherent powers and may do only those things which the Legislature has expressly or by necessary implication placed within their power to do.... *Any fair, reasonable doubt as to the existence of power in a municipality is resolved by the courts against its existence.*" (emphasis added)); *accord Kline v. City of Harrisburg*, 362 Pa. 438, 443, 68 A.2d 182, 184–85 (1949).[2]

Additionally, I differ with the majority's treatment of the statements of the Department of Environmental Protection. Although the *amicus* brief submitted by that agency indicates that it would not be in a position to convey an interest in the submerged lands in question in the form of an "easement,

**2.** I would find that the provisions of the Dam Safety Act, at a minimum, give rise to a substantial doubt that the portions of Act 321 at issue remained in effect at the time the license was granted to HSP. (Indeed, I have difficulty envisioning how the Legislature could have been more explicit in the intended comprehensive scope than to do precisely what it did—i.e., specify that the Dam Safety Act applies to all navigable waters in the Commonwealth, including the Delaware River. *See* 32 P.S. § 693.4, 693.12(a).) As to such uncertainty, the majority emphasizes the principle of statutory construction disfavoring implied repeals. It should be noted, however, that—as is often the case—there are multiple competing principles of construction involved here. The Legislature is presumed to intend to retain its power as against municipalities, thus giving rise to the rule noted above that doubts about municipal authority are resolved against their existence. In this regard, although the majority references *Pennsylvania Turnpike Comm'n v. Sanders & Thomas*, 461 Pa. 420, 336 A.2d 609 (1975), to support its determination that principles regarding implied repeals control here, that case did not involve any competition between state and local power, and thus, did not provide an occasion for this Court to weigh these two rules of construction against each other. As between these two areas of concern with regard to legislative intent, I believe that the one pertaining to the protection of the General Assembly's legislative authority should take precedence. Thus, I depart from the majority's decision to elevate the precept that implied repeals are disfavored as the only controlling principle for resolving doubts concerning the City's remaining authority under Act 321.

right-of-way, license or lease," 32 P.S. § 693.15(a), the Department does not purport to predicate this limitation on the geographical location of the SugarHouse casino. Nor does the Department address the question of whether the City retained authority under the then-existing statutory scheme to grant an "estate or interest" in the submerged lands sought by HSP, which is a precondition to the issuance of a departmental permit. *See* 32 P.S. § 693.15(a) ("No permit shall be granted pursuant to this act for any project to occupy submerged lands of the Commonwealth ... unless the applicant has obtained an easement, right-of-way, license or lease pursuant to this act, or holds an estate or interest in such submerged lands pursuant to other specific authority from the General Assembly."). In fact, the Department clarifies that the reason it would not be empowered to grant a license in this case pertains to its view that the project does not conform to the provisions of Sections 693.15(b) and (c) of the act, *see* Brief at 9 n. 4, which require that the project occupy no more than 25 acres, *see* 32 P.S. § 693.15(c),[3] and that it be undertaken for one of a set of specified purposes not relevant here. *See* 32 P.S. § 693.15(b).[4] Although the Department recognizes that it does not hold exclusive licensing authority under Section 693.15 for the above reasons, this, in my view, does not support an interpretation favoring the vitality of Act 321, as the majority suggests. *See* Majority Opinion, *op.* at 156–57, 954 A.2d at 1179. The Department simply does not address the question of which entity, as between the General Assembly and the City,

3. HSP describes the project as encompassing a proposed site of 22 acres plus submerged lands of 12 acres immediately adjoining that site. *See* Exhibits to HSP's Petition for Review at 9 (Vol.I). Even if this description is construed to mean that the 12 acres are part of the existing 22–acre site, the plan reflects an additional 3.23 acres of newly created greenway, as well as waters between the mainland and a proposed longitudinal pier connected to the mainland by a narrow walkway, *see id.* at 14, for a total of more than 25 acres.

4. These purposes include: improving navigation or public transportation; recreation, fishing, or other public trust purposes; protecting public safety or the environment; providing water supply, energy production, or waste treatment; providing a public utility service by a government agency or subdivision, or public utility or electric cooperative; or other activities which require access to water.

has the relevant licensing authority otherwise, and its submission to this Court is specifically designed to preserve its own licensing authority in its area of statutory empowerment. *See* Brief at 6–7. In this regard, moreover, the Department emphasizes that it is charged with regulating water encroachments in "*all* waters of the Commonwealth," Brief at 7 (emphasis in original), an assertion that accords with the plain text of the Dam Safety Act, which, by its terms, applies to "all" Commonwealth waterways, 32 P.S. § 693.4, including those of the "navigable waters of the Delaware River." *Id.*, § 693.12(a).

Even assuming, *arguendo*, that the relevant portion of Act 321 were still in effect, it would not grant the City the authority to license the use of submerged lands for facilities unrelated to boating or shipping. The critical passage, found in Section 10 of the act, states, in relevant part:

> Whenever any person ... shall desire to construct, extend, alter, improve or repair *any wharf, or other building in the nature of a wharf, or bridge, or other harbor structures,* situate wholly within any city of the first class, such person or persons shall make application to the director, stating in writing the nature and extent of such proposed structure, extension, alteration, improvement or repair ... [,] whereupon, if such proposed structure, extension, alteration, improvement or repair will encroach upon the waterway, the director shall give notice of the time and place of hearing such application, to all parties interested ... and if the director ... shall approve such proposed structure, extension, alteration, improvement or repair, and the plans and specification submitted therefor, he shall give his assent to, and issue a license or permit for, the erection and making thereof....

53 P.S. § 14199 (emphasis added); *see* Majority Opinion, *op.* at 123, 954 A.2d at 1158–59 (quoting the provision in full). Although the above, while it was in effect, does appear to have authorized the City's Commerce Department to convey a property interest in the submerged lands of the river, such authority only existed relative to wharves, bridges, and "other harbor structures." As stated in Act 321's preamble, the statute was enacted in recognition of the growing commerce of

Pennsylvania, and the substantial improvements in the channel-ways of the Commonwealth's rivers and harbors. Thus, the Legislature authorized the City Department of Wharves, Docks, and Ferries (the predecessor to the City Commerce Department) to regulate the development of "wharves, piers, bulkheads, docks, slips and basins." Act 321, § 6; *see* 53 P.S. § 14191 (giving the director power to regulate "bulkhead and pierhead lines," "the distance between piers," and the development of "wharves, piers, bulkheads, docks, slips, and basins" within Philadelphia city limits). This limited scope of authority also obtains in Section 10 of the act, as quoted above. According to HSP's site plan, the facilities that will encroach beyond the established bulkhead of the Delaware River into Commonwealth-owned lands include such features as a slots venue, hotel, parking garage, retail space, and restaurants. A slots casino, together with all of its surrounding commercial entities, can be located inland and has no inherent connection to water travel or water-related commerce. Therefore, regardless of how beneficial these items may appear to the City, they are not in the nature of a wharf, bridge, or any other harbor structure.[5] Accordingly, the construction of such facilities upon submerged lands does not appear to have been contemplated by Section 10 of Act 321,[6] and, again, any doubt on the question must be resolved against the existence of the City's authority.

Finally, the majority predicates its finding that the revocation of the license was invalid on a "reliance interest" in favor

5. Under the maxim of *ejusdem generis*, general terms in a statute take their meaning from the preceding particular ones. *See Independent Oil & Gas Ass'n of Pa. v. Board of Assessment Appeals of Fayette County*, 572 Pa. 240, 246, 814 A.2d 180, 184 (2002). Here, "other harbor structure" must be understood within the context of the preceding examples, namely, wharf, other building in the nature of a wharf, and bridge. Additionally, the other facilities addressed by the statute (piers, bulkheads, docks, slips, and basins), are specifically related to the waterfront as such. It would be unreasonable to assert that a slots casino is a "harbor structure" simply because its owner decides to place it adjacent to a river. Likewise, even to the extent HSP's overall plan contains water-related components as ancillary uses, under Act 321 the City's encroachment authority could only extend to those components.

6. In this regard, it is noteworthy that the 1978 Opinion of the Attorney General speaks generally of "facilities,", and does not address the

of HSP, stating that "the record is replete with evidence of reliance." Majority Opinion, *op.* at 164–65, 954 A.2d at 1183–84. However, it does not reference any authority to support the existence of such an interest as a legal matter, and there is no evidentiary record that could show actual reliance, as no hearing has taken place on the factual question of whether HSP reasonably and detrimentally relied on the license.[7] In this respect, moreover, although the revocation of a license by a newly installed city administration may raise concerns relative to the stability of property rights, *see generally Borough of Malvern v. Agnew,* 11 Pa.Cmwlth. 285, 314 A.2d 52, 53 (1973), countervailing policy considerations arise where, as here, the mayoral election occurred before the license was issued, and the views of the incoming mayor on the subject were well known. More particularly, it appears that the outgoing administration sought, by issuing the license in its waning days, to bind the successor administration regarding a topic of substantial local public importance on which they disagreed. *Cf. Program Admin. Svcs., Inc. v. Dauphin County Gen'l Auth.,* 593 Pa. 184, 196–97, 928 A.2d 1013, 1020 (2007) (recognizing that contracts pertaining to government functions may be rescinded by a successor municipal governing body to avoid "bad faith efforts on the part of lame duck administrations to handcuff their successors." (internal quotation marks omitted)).

Because I would find that the City did not possess the legal authority to issue the license in the first place, I would deny HSP's request to have the City's revocation of that license declared invalid.

Justice McCAFFERY, dissenting.

I respectfully dissent from the majority's holdings that Act 321 was not repealed by the Dam Safety and Encroachments

separate topic of whether the legislation in question was intended to authorize riparian licenses for casinos or other non-harbor-related structures.

7. Even if such reliance has occurred, it is unclear why monetary compensation by the City would not constitute a legally sufficient remedy.

Act of 1978, as amended effective October 23, 1979, ("Dam Safety Act")[1] and that the City of Philadelphia acted without authority in its revocation of the license issued to Petitioner on November 27, 2007. Rather, because I believe that the provisions of Act 321 providing for the City of Philadelphia to exercise authority over the submerged lands of the Delaware River in Philadelphia are irreconcilable and inconsistent with the Dam Safety Act, I conclude it is the Commonwealth that has sole authority to grant permission to use those submerged lands. In addition, I believe that the City acted properly in revoking a license which it had no authority to have conferred.

Where two statutes are irreconcilable, the latter statute shall be construed to repeal the earlier statute. 1 Pa.C.S. § 1971(c).[2] While the majority recognizes this statutory mandate and concludes that Act 321 and the Dam Safety Act are not irreconcilable, it does not support its conclusion with a persuasive analysis. Rather, the majority determines that the two acts are not irreconcilable largely on the basis of its observation that the Dam Safety Act expressly repealed Act 322 and did not expressly repeal Act 321. *See* Majority Opinion, *op.* at 150–51, 152–54, 954 A.2d at 1175, 1176–77. However, the majority fails to adequately take account of the express language of the Dam Safety Act, which demonstrates in the clearest of terms that the General Assembly intended to establish itself, and other Commonwealth entities, as possessing the sole authority to grant use of the submerged lands in the Delaware River in Philadelphia.[3]

1. 32 P.S. §§ 693.1–693.27.

2. In addition, in determining legislative intent, all sections of a statute are to be read "together and in conjunction with each other" and are to be construed "with reference to the entire statute," giving effect to all the statutory provisions. 1 Pa.C.S. § 1921(a); *Housing Authority of the County of Chester v. Pennsylvania State Civil Service Commission*, 556 Pa. 621, 730 A.2d 935, 945 (1999). If possible, we avoid a reading that would lead to a conflict between different statutes or between individual parts of a statute. *Id.* at 946.

3. This omission is particularly incongruous in light of the majority's determination, albeit a correct one, that Section 1506 of the Gaming Act vests this Court with exclusive appellate jurisdiction over this appeal. *See* Majority Opinion, *op.* at 141–42, 954 A.2d at 1170. The majority refuses to apply Section 19 of Act 321, which vests in the

The Dam Safety Act applies to all encroachments located in, along, across, or projecting into any watercourse within the Commonwealth. 32 P.S. § 693.4. The Dam Safety Act mandates that no person shall construct an encroachment without a prior written permit of the Department of Environmental Protection of the Commonwealth of Pennsylvania ("DEP"). *Id.,* § 693.6. The Dam Safety Act enjoins the issuance of a permit for any project to occupy submerged lands of the Commonwealth in any navigable river unless the applicant has obtained an easement, right-or-way, license or lease pursuant to the Dam Safety Act, or unless the applicant holds an estate or interest in the submerged lands pursuant to "other specific authority" from the General Assembly. *Id.,* § 693.15(a). No one can obtain a title, easement, right-of-way or other interest in the submerged lands of the Commonwealth except as specifically provided by Section 693.15 of the Dam Safety Act or by "other specific authority" from the General Assembly. *Id.,* § 693.15(e). The Dam Safety Act further provides that all encroachments in the navigable waters of the Delaware River are subject to the approval of the Navigation Commission for the Delaware River, a Commonwealth entity. *Id.,* § 693.12.

Read in conjunction with each other, the provisions of the Dam Safety Act require any person or entity who or which desires to erect an encroachment in the submerged lands in the Delaware River in Philadelphia to 1) obtain an easement, right-of-way, license or lease from the DEP under Section 693.15(b) or pursuant to other specific authority from the General Assembly;[4] and 2) obtain a permit from the DEP authorized by the Navigation Commission. In my view, these

courts of common pleas jurisdiction over appeals from city licensure decisions, in holding that Section 1506 vests this Court with such jurisdiction where a licensed gaming facility is involved. I fail to discern how we may properly reject Act 321's appeal provision on the basis of Section 1506 of the Gaming Act, and yet conclude that Act 321 retains intact its licensing authority provision primarily on the basis that the Dam Safety Act does not expressly repeal Act 321. Section 1506 does not expressly repeal Act 321 either.

4. There is no dispute that the General Assembly has not exercised its authority to specifically allow Petitioner to encroach upon the submerged lands in the Delaware River for the development of its gambling establishment.

mandates of the Dam Safety Act are irreconcilable with the authority granted to the Philadelphia Director of Commerce in Act 321 to issue a license or permit to a person who desires to construct a harbor structure which will encroach upon the Delaware River. *See* 53 P.S. § 14199.

I consider the majority's suggestion that the City of Philadelphia and the General Assembly each has authority to grant use of the submerged lands in the Delaware River in Philadelphia to be untenable. *See* Majority Opinion, *op.* at 157, n. 21, 954 A.2d at 1179, n. 21. I believe it is self-evident that either the City or the Commonwealth, but not both, has authority over a specific, finite piece of submerged real estate. To posit that both the City and the Commonwealth have the authority to grant a license for use of a single, definable portion of a river's submerged lands is to allow for the possibility that two separate licensees may obtain encroachment rights over the same stretch of river. I view such a circumstance as an invitation to wreak havoc through the creation of antagonistic, mutually excludable possessory interests.

In addition, I am in agreement with Mr. Justice Saylor that the general repealer provision of the Dam Safety Act, 32 P.S. § 693.27(b), repealed Act 321 and vested the Commonwealth with the sole authority to grant permission to use submerged lands in the Delaware River in Philadelphia. The broad scope of the Dam Safety Act, coupled with the general repealer clause which repealed all other acts or parts of acts inconsistent with the provisions of the Dam Safety Act, compels the conclusion that the sole authority to grant use of the submerged lands in the Delaware River in Philadelphia lies with the Commonwealth. Further, I am persuaded by Justice Saylor's observation that the principle of statutory construction that favors the General Assembly's protection of its own authority should take precedence over the general principle of disfavoring implied repeals. *See* Dissenting Opinion by Saylor, J., *op.* at 168–70 n. 2, 954 A.2d at 1186–87 n. 2.

The actions of the General Assembly in granting leases to lands within the bed of the Delaware River in Philadelphia subsequent to the passage of the Dam Safety Act 1979 amend-

ments reinforces my conclusion that Act 321 and the Dam Safety Act are irreconcilable. To wit, the following acts are examples of the exercise of the General Assembly's authority:

1. Act of December 9, 1980, 1980 Pa. Laws 201—Reciting that the Commonwealth owns the lands within the bed of the Delaware River between the bulkhead and pierhead lines and **leasing a portion of the bed of the river in Penn's Landing to the City of Philadelphia** for the purposes of development for residential, office, commercial, condominium, or other uses;

2. Act of July 13, 1988, 1988 Pa. Laws 89—Reciting that the Commonwealth owns the lands within the bed of the Delaware River and providing for the **leasing of Pier Numbers 28 South, 30 South, 34 South, 35 South, and 36 South to the City of Philadelphia** for the purposes of development for residential, office, commercial, condominium, hotel, marina or other uses;

3. Act of December 20, 1989, 1989 Pa. Laws 76, amending the Act of December 9, 1980—Reciting that the Commonwealth owns the lands within the bed of the Delaware River and providing for the **leasing of Pier Numbers 3 and 5 to the City of Philadelphia** for the purposes of development for residential, office, commercial, condominium, hotel, marina or other uses;

4. Act of December 21, 1998, 1998 Pa. Laws 137—Reciting that the Commonwealth owns the lands within the bed of the Delaware River and providing for the leasing of Pier Numbers 12 North, 13 North, 15 North, 19 North, and 24 North in Philadelphia for the purposes of development for residential, office, commercial, condominium, hotel, marina or other uses;

5. Act of February 5, 2004, 2004 Pa. Laws 4—Reciting that the Commonwealth owns the lands within the bed of the Delaware River and providing for the leasing of Pier Numbers 36 North, 37 North, 38 North, and 39 North in Philadelphia to Isle of Capri Associates for the purposes of development of a condominium community;

6. Act of July 5, 2005, 2005 Pa. Laws 34—Reciting that the Commonwealth owns the lands within the bed of the Delaware River and providing for the leasing of Pier Number 25 North and the boat slip located south of it to Pier 25 North Associates for the purposes of development of a condominium community;

7. Act of February 22, 2008, 2008 Pa. Laws 4—Reciting that the Commonwealth owns the lands within the bed of the Delaware River and providing for the leasing of Pier Number 35½ North to VTE Philadelphia, LP, for the purposes of development of a condominium community. The Act provides that no portion of the leased parcel shall be used as a "licensed facility," *i.e.*, the physical land-based location at which a licensed gaming entity is authorized to place and operate slot machines. The Act further provides:

> The General Assembly hereby affirms its existing, sole and exclusive authority to consider and specifically authorize the conveyance of any title, easement, right-of-way or other interest in Commonwealth-owned lands, such as those set forth herein pursuant to the act of April 9, 1929 (P.L. 177, No. 175), known as The Administrative Code of 1929, and the act of November 26, 1978 (P.L. 1375, No. 325), known as the Dam Safety and Encroachments Act.

8. Act of February 22, 2008, 2008 Pa. Laws 5—Reciting that the Commonwealth owns the lands within the bed of the Delaware River and providing for the leasing of Pier Number 53 North to NCCB Associates for the purposes of development of a condominium community. The Act provides that no portion of the leased parcel shall be used as a "licensed facility," i.e., the physical land-based location at which a licensed gaming entity is authorized to place and operate slot machines. The Act further provides:

> The General Assembly hereby affirms its existing, sole and exclusive authority to consider and specifically authorize the conveyance of any title, easement, right-of-way or other interest in Commonwealth-owned lands, such as those set forth herein pursuant to the act of April

9, 1929 (P.L.177, No.175), known as The Administrative Code of 1929, and the act of November 26, 1978 (P.L.1375, No.325), known as the Dam Safety and Encroachments Act.

By these legislative enactments, the General Assembly has consistently exhibited and exercised its authority to award use of the lands within the bed of the Delaware River in Philadelphia to public and private lessees for development and renewal purposes. Most telling is the 1980 legislative act, by the **same legislative session** that passed the Dam Safety Act, that authorized the Commonwealth to enter into a lease with the **City itself,** for the development of Penn's Landing. Similarly, in 1988 and 1989, the Commonwealth leased submerged lands to the City for development. One is hard-pressed to conceive a reason for these leases to have been issued by the Commonwealth of Pennsylvania to the City of Philadelphia if the City, in fact, had retained authority itself, pursuant to Act 321, to award use of the lands in the bed of the Delaware subsequent to the passage of the Dam Safety Act amendments in 1979.

The recent affirmations in Acts 4 and 5, passed February 22, 2008, make explicit that which has been implicit since the repeal of Act 321 by the Dam Safety Act: because the Commonwealth owns the land within the Delaware River bed, it has the sole authority to authorize the conveyance of any interest whatsoever therein. Therefore, I conclude that the City did not have the authority in November 2007, to issue a license for development of the submerged lands in the bed of the Delaware River, and that the license it issued on November 27, 2007, was invalid.

I also disagree with the majority's conclusion that the City did not have the power to revoke the license once it was issued. Licenses for the use of submerged lands have been deemed revocable in this Commonwealth for centuries. *See Susquehanna Canal Company v. Wright,* 9 Watts & Serg. 9, (Pa.1845) (stating that the license accorded to riparian owners to erect mill-dams in navigable streams was defeasible and subject to revocation when necessitated by the paramount interest of the public); *Barclay Railroad and Coal Co. v.*

*Ingham,* 36 Pa. 194, 200 (1860) (emphasis supplied) ("When the Commonwealth, by its legislature, authorized riparian owners along [navigable] streams, to erect dams for their own convenience and profit, it was a sort of public license, like the fisheries and ferries, which, by numerous Acts of Assembly, were granted in all our public rivers. And **being a mere license** to trespass on the public domain, without any consideration received therefore, **it had none of the indefeasibility of a contract, and might be revoked at the will of the sovereign,** or be granted to another."); *Rundle v. Delaware and Raritan Canal Co.,* 55 U.S. 80, 94, 14 How. 80, 14 L.Ed. 335 (1852) (emphasis supplied) applying Pennsylvania law, "[T]he River Delaware is a public, navigable river, held by its joint sovereigns, in trust, for the public; **that riparian owners of land have no title to the river, or any right to divert its waters, unless by license from the State. That such license is revocable, and in subjection to the superior right of the State,** to divert the water for public improvements."; and *Philadelphia v. Commonwealth,* 284 Pa. 225, 232, 130 A. 491, 494 (1925) (stating that since "an early date," licenses to holders of riparian rights to build piers were held revocable at will.). *Compare Schechter v. Zoning Board of Adjustment of Township of Hampton,* 395 Pa. 310, 316, 149 A.2d 28, 32 (1959) (emphasis in original) (holding that municipalities have a right to contest the issuance of a previously-issued permit "if there be a question as to whether or not the permit or variance was properly and legally issued.").

In the instant case, I conclude that the City has advanced an eminently valid reason for the January 24, 2008 revocation, *i.e.,* that the former director of commerce acted *ultra vires* and in contravention to state law in awarding the license. Any reliance Petitioner may have placed upon the City's licensure decision would have been entirely unjustified in light of the timely appeal of that decision. Because Petitioner was on notice that the November 27, 2007 license was being challenged, the expenditure of funds, if any, in reliance upon the validity of that license was neither reasonable nor justified.

In sum, I would hold that Act 321 was repealed by the Dam Safety Act, that the City of Philadelphia had no authority to issue the November 27, 2007 license to the submerged lands of the Delaware River, and that the City did have the authority to revoke the license it had issued illegally. Therefore, I must respectfully dissent from the holding of the majority.